(Decided 12th December, 1878.)

---

HENRY McSHANE and JOHN McSHANE *vs.* HENRY R. HAZLEHURST.

*When a Court of Equity will Rescind an executed Contract of*
*Sale—Party not to be relieved from his Contract merely be-*
*cause he may have made a Bad Bargain.*

Where a party has been induced to enter into a contract of sale by the fraudulent misrepresentations of the other party, or his agent, of material facts upon which he relied and had a right to rely, a

Court of equity will grant him relief by refusing to decree a speci-
fic performance, or by annulling the contract after it has been car-
ried into execution by the delivery of deeds to the purchaser; but
in such case the *onus* is on the complainant to establish the allega-
tions of his bill, by clear and conclusive proof.

A party cannot be relieved from his contract, merely because he may
have made a bad bargain.   A contract having been deliberately
made and carried into execution, cannot be rescinded or set aside,
at the instance of the party who alleges that he has been deceived
and injured, except upon the clearest and most satisfactory proof.

APPEAL from the Circuit Court for Howard County, in
Equity.

In addition to the statement of the case as contained
in the opinion of the Court, the following Exhibits
referred to therein, are inserted:

### Exhibit A.

The farm known as "Mount Hebron," containing five
hundred and eighty acres, more or less, with the following
articles: 7 horses, 4 oxen, 1 farm wagon, hay carriage, 1
market wagon, 2 ox carts, 1 horse cart, 1 iron roller, 7 2
and 3 horse plows, 2 harrows, thresher and horse power,
1 Dorsey's reaper, 1 mower for grass, 1 fan, 1 hay press,
1 corn mill, 1 corn sheller, 3 cradles, 5 scythes, 4 double
shovel plows, 1 single shovel plow, 5 cultivators, 1 drill,
2 small plows, 1 circular saw and table, 3 ox yokes and 2
chains, 1 straw cutter, 1 cider press, small tools, shovels,
forks, &c., in and about the farm; plow, wagon and other
harness, bags, 32 ewes, and 1 ram, and lambs, if any,
(cows and heifers, twelve,) wheat in the ground, 73¼ acres,
and fertilizers, fodder, straw and shucks, 40 bbls. corn.
The above farm and personal property, valued at fifty-five
thousand dollars, to be given in exchange by Henry R.
Hazlehurst, of Howard County, for the following property
belonging to Messrs. McShane, of Baltimore City, to wit:

McShane *vs.* Hazlehurst.

A large hotel on Pratt St. and Market Space, known as the "Centennial Hotel," now occupied by Mr. Stuart, as proprietor, under a lease of five years from its date, at five thousand dollars per annum, not including the four store rooms, subject to a ground rent of $2800 per annum. Also 2 houses, Nos. 3 and 5, on Oliver Street, each being 16 feet 10 inches, by 73 feet 6 inches deep, which ground-rent on each is $75; 2 houses on Fremont St. Nos. 457 and 485, being 16 feet by 60 deep, subject to a g. rent each, of $60; 2 houses on Gilmor St., 16 feet 8 inches front, by 156 ft. 10 inches deep, to an alley, subject to a ground-rent each, of $50.

Witness our hands, this 17th day of March 1876.

JOHN K. WHITE,
Agt. for McShane & Co.
JOHN R. D. THOMAS,
Agt. for H. R. Hazlehurst.

*Exhibit B.*

BALTIMORE, March 21, 1876.

I, H. R. Hazlehurst, of Howard County, Md., do hereby propose and bind myself, my heirs, &c., to give in exchange my farm, known as "Mount Hebron," in Howard County, containing five hundred and sixty-six acres, more or less, with the buildings thereon, and the following articles, viz: 7 horses, 4 oxen, 1 farm wagon, 1 hay carriage, 1 market wagon, 2 ox-carts, 1 horse cart, 1 iron roller, 7 2 and 3 horse plows, 2 harrows, thresher and horse power, 1 Dorsey reaper, 1 mower for grass, 1 fan, 1 hay press, 1 corn mill, 1 corn sheller, 3 cradles, 5 scythes, 4 double shovel plows, 1 single shovel plow, 5 cultivators, 1 drill, 2 small plows, 1 circular saw and table, 3 ox yokes and 2 chains, 1 straw cutter, 1 cider press, small tools, shovels, forks, &c., in and about the farm; plow, wagon and other harness, bags, 32 ewes and 1 ram, and lambs, if any, 12 cows and heifers, 73¼ acres of wheat in the ground, fertili-

zers, fodder, straw and shucks, 40 bbls. corn, to Henry McShane & Co., of Baltimore City, Md., for their houses, described as follows, viz: a large hotel on Pratt St. and Market Space, known as "The Centennial Hotel," now occupied by Mr. Stuart, as proprietor, under a lease of five years from its date, at five thousand dollars per annum; the same being subject to a ground-rent of twenty-eight hundred and twenty-six dollars and forty cents per annum. Also 2 houses, Nos. 3 and 5, on Oliver Street, being 16 feet 10 inches, by 73 feet 6 inches deep, more or less: subject to a ground-rent on each of $75. Also 2 houses on Fremont St., Nos. 457 and 485, being 16 feet by 60 deep, more or less; subject to a ground-rent on each of $60. Also two houses on Gilmor Street, 16 feet 8 inches, by 156 feet 10 inches deep, more or less, to an alley; subject to a ground-rent of $50 on each. All expenses, charges, &c., of every kind on the above property, to be paid and cleared to this date. The stores above described to be cleaned up and painted.

Witness my hand, the day and date above written.

H. R. HAZLEHURST,
HENRY McSHANE & Co.

Witness:—John R. D. Thomas.

MARCH 21, 1876.

We, Henry McShane & Co., do hereby accept the proposition of H. R. Hazlehurst, and agree and bind ourselves, our heirs, &c., to execute the same.

HENRY McSHANE & Co.

Witness:—John K. White.

McShane *vs.* Hazlehurst.

*Complainant's Exhibit No. 3.*

OFFICE AND SALESROOM, 161 NORTH ST.,
(opposite N. C. R. W. Depot.)
BALTIMORE, April 1st, 1876.

Mr. C. P. Stuart,
Bought of Henry McShane & Co.,
Brass and Iron Founders and Finishers.

1875.

| | | |
|---|---|---|
| To 8 months rent of hotel, Pratt St., to date, @ $5,000.00..................... | | $3,333 32 |
| July 17. By cash pd. hand............ | $ 9 00 | |
| Aug. 12. " " " " .... ....... | 5 00 | |
| Sept. 2. " " ................. ........ | 200 00 | |
| 17. " " ................. ..... | 100 00 | |
| Oct. 12. " " ......... ............... | 125 00 | |
| '76. | | |
| Jan. '76. " " ......... ........ ..... | 378 87 | |
| | | 817 87 |
| | | $2,515 45 |

Recd. payment,

HENRY McSHANE.

The Court below (MILLER and HAMMOND, J., concurring, and HAYDEN, J., dissenting,) being of opinion that the complainant was entitled to the relief sought by the bill, passed a decree to that effect. From this decree the defendants appealed.

The cause was argued before BARTOL, C. J., STEWART, BRENT, ALVEY and ROBINSON J., and subsequently re-argued on notes, BOWIE, J., participating in the decision.

*John Carson* and *F. W. Brune,* for the appellants.

Concealment, to be a fraud, must be of facts which one party is under some legal or moral obligation to communi-

cate to the other, and which that other has a right to know not merely in *foro conscientiæ* but *juris et de jure.* 1 *Story's Eq. Jur.*, secs. 206–208; *Powell vs. Bradlee,* 9 *G. & J.,* 220.

We are not bound to disclose where there is no fiduciary relation, as vendor and purchaser. *Young vs. Bumpas,* 1 *Freeman Chan. Decis.,* 241; *Walters vs. Morgan,* 3 *De G., F. & J.,* 718; *Van Arsdale vs. Howard,* 5 *Ala.,* 596; *Smith vs. Hughes,* 6 *Queen's Bench,* (*Law Rep.,*) 597.

We ask the Court's attention to two cases of concealment where the Court held there was no duty to disclose, and they cover this case. *Abbott vs. Suorder,* 4 *De G. & Smale,* 449; *Dolman vs. Nokes,* 22 *Beav.,* 402.

A person who knows that a mine is under another's land, of which that other is ignorant, is not bound to communicate. *Harris vs. Tyson,* 24 *Penna. State,* 347; *Fox vs. Mackreth,* 1 *B. C. C.,* 420; *Turner vs. Harvey, Jacob,* 178.

Where the means of information are equally open to both parties, or if one party undertake to examine, he cannot rescind, even if false representations are made. *Jennings vs. Broughton,* 5 *De G., M. & G.,* 126; *Same vs. Same,* 17 *Beavan,* 234; *Slaughter vs. Garson,* 13 *Wallace,* 379; 1 *Story's Eq.,* secs. 147–149; *Atwood vs. Small,* 6 *Cl. & Fin.,* 232; *Haywood vs. Cope,* 25 *Beavan,* 140; *Clapham vs. Shillito,* 7 *Beavan,* 146.

The necessity to inquire, and non-disclosure of material facts, do not vitiate a contract between principal and surety. *Magee vs. Man. L. Ins. Co.,* 92 *U. S.,* (2 *Otto,*) 99. Same doctrine between tenants in common. *Matthews vs. Bliss,* 22 *Pick.,* 48.

There is a clear distinction between an attempt to enforce an executory contract and to rescind a deed executed; in the latter case, you must prove actual fraud. *Wilde vs. Gibson,* 1 *H. of Lords,* 605, 616–617–632; 1 *Story's Eq. Jur.,* sec. 206.

---

McShane *vs.* Hazlehurst.

---

A purchaser having made no enquiry as to title, is not entitled to relief for non communication of any defect. Fraud in agent not sufficient. If fraud in agent is relied on, it must be set up in the bill.

If the charge be fraud, and not proved, complainant cannot rely on any other ground.

But, says the majority opinion of the Court below, you undertook to disclose, and therefore were bound to tell of the rent in arrear. Respectfully we say this is begging the question! Because we have only done what the law required us to do, viz: state the fact of the lease, therefore we must state every collateral matter which might affect the purchaser's mind. Did the Court of Chancery, in 4 *De G. & S.*, 447, hold that because the vendor said his land was rented for 15 shillings per acre, that he was bound to tell that the tenant claimed it was not worth half that price, and that he would not hurt him as to the rent? We here simply communicated the fact of the lease as an element of title; not one word have we said about the lease or the property, good or bad; not a nod or a wink have we made. How, then, have we disclosed?

The appellants were bound to disclose only those facts which affected their power to give the purchaser what he contracted for. 1 *Dart on Vendor and Purchaser*, 87.

*James Mackubin* and *Geo. Hawkins Williams*, for the appellee.

Equity relieves against the fraudulent representation of a material fact as to which one party places confidence in the other, constituting an inducement to the contract, and which actually misleads. *McAleer vs. Horsey*, 35 *Md.*, 439; *Smith vs. Richards*, 13 *Pet.*, 26.

The representation of the earnings of a public house is of a material fact in a contract for its sale. *Pilmore vs.*

*Hood,* 5 *Bingham N. C.,* 97; *Irving vs. Thomas,* 18 *Maine,* 418.

Whether Henry or John McShane or their agent, one or all, made the fraudulent representation, is alike immaterial. Participation in the result of a fraud is equivalent to preconcert for its execution. *Lincoln vs. Clafflin,* 7 *Wallace,* 138; 1 *Story's Equity Jur.,* (11*th Ed.,*) *sec.* 193 *a.*

That Hazlehurst enquired as to everything else but the payment of the rent is immaterial. He had a right to rely, and did rely, as he swears, on the reputed good character of the McShanes, that they would not misrepresent. Besides, Stuart's relation to the McShanes was a confidential one—landlord and tenant. *Lysney vs. Selby,* 2 *Lord Raymond,* 1121; *Pasley vs. Freeman,* 3 *T. R.,* 51, 56; *Irving vs Thomas,* 18 *Maine,* 424.

And also credulity on his part, no license to them to defraud on their part. *Weatherford vs. Fishback,* 3 *Scam.,* (*Ill.,*) 170.

The character of the appellants was not in issue, and evidence as to it was inadmissible. *Humphrey vs. Humphrey,* 7 *Conn.,* 116; *Harrison vs. Russell,* 1 *Willson,* (*Ind.,*) 392; *Porter vs. Seiler,* 23 *Penn.,* 424; *Att. Genl. vs. Bowman,* 2 *Bos. & P.,* 532, *note a.*

BARTOL, C. J., delivered the opinion of the Court.

It appears from the record in this case, that the appellee being desirous of disposing of a tract of land with the improvements, farming utensils and personal property thereon, situated in Howard County, employed John R. D. Thomas, a broker in the City of Baltimore, who entered into negotiations with John K. White, another broker employed by the appellants, for an exchange of the farm and personal property thereon, for certain leasehold estate in the city.

These negotiations led to a written contract dated March 17th 1876, and signed by the brokers, as agents for their

respective principals, marked "exhibit A" (*ante p.* 108.) The appellee not being satisfied with the contract, and denying the authority of Thomas to make it, further negotiations were had, resulting in agreement "B" (*ante p.* 109,) whereby the appellee agreed to take in exchange for his farm and the personal property thereon, estimated as of the value of $40,000, certain leasehold estate in Baltimore City, belonging to the appellants, consisting of two dwelling houses on Oliver Street, two on Fremont Street and two on Gilmor Street, estimated at $15,000, and a large hotel situated on Pratt Street and Market Space, known as "The Centennial Hotel," estimated at $25,000.

This agreement is dated March 21st 1876, and was signed by the appellee and appellants, and was carried into effect on the 6th day of April following, by the execution of deeds of conveyance between the parties, which were delivered on the 7th day of April.

On the 4th day of May ensuing, a bill of complaint was filed by the appellee praying that the contract and the deeds be annulled and set aside, upon the ground of fraud. The fraud is alleged with reference to the hotel; as regards the other property the appellee makes no complaint.

The hotel is described in the contract as "*now occupied by Mr. Stuart as proprietor*, under a lease of five years from its date at $5000 *per annum*; the same being subject to a ground-rent of $2826.40 *per annum.*"

Under the hotel were four stores not occupied by Stuart under his lease, but included in the contract of exchange. With respect to these, the bill alleges that "it was averred that they would rent though then unoccupied, for the sum of $1200 *per annum.*" It is not stated in the bill by whom this alleged representation as to the rental value of the stores was made; and there is no proof in the case that any such representation was made by the appellants or their agent. It may therefore be dismissed from our consideration.

With ·respect to the hotel proper, the frauds charged in. the bill are of the most serious and flagrant character.. They are substantially as follows:

It is alleged that it was represented that the hotel was. ·under a lease to a good tenant for five years, producing a. rental of $5000 *per annum*, payable monthly, with liberty to the tenant to renew his lease for other five years, and also· to buy out absolutely the interest of the lessors, for the sum of $35,000, at any time during his lease.   That, in-duced by these statements and confiding therein, the· appellee visited and inspected the premises, and found Stuart in the occupancy thereof, ostensibly carrying on the business of a hotel well equipped with suitable furni-ture and apparel, of which he seemed to be the owner,. and that no statements were made inconsistent with the· visible appearance of things, but on the contrary were· concealed.

That deluded by said appearances, and fully confiding in the statements that the hotel did produce such rental,. and that the occupancy was really deemed by the parties. sufficiently valuable to be worth redemption, or buying· out for the large sum above specified, by reason of the profitable business done upon the premises, and that the· said lease was in no respect a sham, but represented a real valid and subsisting lease, producing in reality the rental therein called for; that the appellee confided in these· statements, and had a right so to confide in the represen-· tation so made, and having no ability or opportunity to discover any thing to the contrary, he accepted the offer· of the several pieces of property in exchange for his farm,. and consummated the said exchange by interchanging· deeds.

The bill then charges that shortly thereafter and within a few days past, (prior to the filing of the bill,) the appel-lee had discovered that in the transaction he had been grossly deceived, and defrauded by the appellants, John.

McShane and Henry McShane, in the following manner to wit:

1. That so far from the hotel producing the rental of $5000 *per annum*, in monthly payments of $416.66, that Stuart's term as appeared by the lease, had commenced on the first day of August 1875, that up to April 1st 1876 eight months rental had accrued viz: the sum of $3333.33⅓ and which to accord with the representations, ought to have been paid by Stuart in monthly payments, but that he had paid only $817.17 in small sums, and at irregular intervals, and had settled the balance $2515.45 by giving his note at 90 days; and that to frustrate any discovery that such rent was in arrear, should any intending purchaser inquire, the appellants had receipted the bill with the words " Rec'd Payment," when in fact Stuart's note at 90 days was taken, the appellants stating to Stuart that the payment of the note would not be exacted of him. The bill charges that such pretended settlement was designedly made as a part of a fraudulent condition of things, intended to dupe and deceive the appellee, and to give color of truth to the other representations so made as aforesaid.

2. The bill further charges, on information and belief that in January 1876, Stuart had informed the appellants or one of them, of his inability to pay the rent, that the business of the hotel barely sufficed to pay its ordinary expenses; that Stuart's accounts of the business of the house, which were faithfully kept, were at that time examined by the appellants or one of them, and Stuart was informed by them that the terms of the lease might be considered as practically to be disregarded; and therefore when the appellee was assured that the hotel was leased at a rental of $5000, the appellants knew that this assurance was false, and that the tenant was barely meeting his expenses and unable to pay rent.

3. The bill further alleges that when the appellee visited the hotel he found it well equipped with furniture

suitable for the business, and Stuart in the occupancy, ostensibly the owner thereof; that within a few days past, he had discovered that the appellants had been heretofore sole owners of the furniture, and had merely entered into some contract for the sale thereof to the tenant, he to pay for the same by instalments. That the tenant being unable to pay any thing on account thereof, the appellants had informed him, (the tenant,) that his not owning the furniture had twice frustrated a sale of the hotel, and that for the purpose of avoiding any future frustration of a sale, Stuart might consider the furniture as his property, and gave the same to him, so that he might not only appear, but be really the owner thereof; and that the appellants having so used the furniture and equipment of the hotel, for the deception of the appellee, and to accomplish the exchange, afterwards denied their gift of the same to Stuart, and threatened to take the same away claiming it as their property.

The bill charges that these doings of the appellants were intended to dupe and deceive the appellee, and did so dupe and deceive him, and instead of getting a property producing a rental of $5000 per year, as stated, he has discovered that he has palmed off upon him property producing no rental whatever.

The appellants in their answer, admit the employment of White to dispose of their property, the execution of *contract A,* by the brokers, White and Thomas, and its repudiation by the appellee, and aver that after repudiating "contract A," the appellee took charge of the whole matter, carefully examined and inquired as to the whole property, that he acted with great deliberation and caution in the transaction, and that "*contract B*" was then entered into, being the appellee's own offer, that it was faithfully carried out on both sides. They deny all the allegations of fraud contained in the bill, and aver that the appellants' action in the transaction was in entire good faith throughout.

McShane *vs.* Hazlehurst.

The rules which govern Courts of equity in cases of this kind are well settled. Where a party has been induced to enter into a contract of sale by the fraudulent misrepresentations of the other party, or his agent, of material facts upon which he relied and had a right to rely, a Court of equity will grant him relief by refusing to decree a specific performance, or by annulling the contract after it has been carried into execution by the delivery of deeds to the purchaser; but in such case the *onus* is on the complainant to establish the allegations of his bill by clear and conclusive proof. "The Court will not rescind the contract without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them." 1 *Story's Eq. Jur., sec.* 200; *Atwood vs. Small,* 6 *Cl. & F.,* 233.

In the language of Justice STRONG in *Atlantic Delaine Co. vs. James,* 4 *Otto,* 214, "cancelling an executed contract is an exertion of the most extraordinary power of a Court of equity. The power ought not to be exercised except in a clear case, and never for fraud, unless the fraud be made clearly to appear; never for false representations, unless their falsity is clearly proved, and unless the complainant has been deceived and injured thereby."

These principles being well settled, it is unnecessary to refer particularly to the numerous cases cited in the argument, in which they have been applied. The cases all depend upon their special facts and circumstances, and can afford, but little aid in governing our judgment in the present case, which must be decided upon the proof as it appears in the record.

In framing the allegations of the bill, it is obvious that the complainant has proceeded mainly upon the representations made to him by Stuart, the tenant, some weeks after the contract had been made and carried into effect. Upon these representations, almost exclusively,

are based the averments contained in the bill, charging the appellants with fraudulent and dishonest concealments, and contrivances for the purpose of deceiving and deluding the appellee, and inducing him to enter into the contract.   To support these charges the appellee relies on the testimony of Stuart, which it is our duty to examine with some care and particularity.   His statement is to this effect, that in January 1876, the appellant Henry McShane was informed by him that he was unable to pay his rent, that the business of the house did not pay current expenses, that the books of the hotel were then examined by Henry McShane who told him a few days afterwards "never mind, not to say anything about this, to go on and run the house, and say nothing about it, that they wanted to sell it, and that I should not lose anything by it; if any person should ask me about the business of the house, to tell them it was good, and that I was doing very well.   A few days after that he came up, and proposed to give me the furniture." (Ans. to 12th Int.)

In answer to the 8th Interrogatory he says, "most of the furniture, belonged at one time to Mr. McShane.   In the latter part of February, he was at the hotel, and told me that his ownership of the furniture in the hotel had upset two trades or sales of the property.   He said, I am going to give it all to you, and if anybody should ask who it belonged to, I was to tell them it was mine and everything in the house belonged to me."   He further states, in effect, that McShane at the same time agreed to give up all claim for arrears of rent, and that when he gave his note in settlement on the 5th day of April 1876, it was understood the payment of the note would not be required of him.

The effect of this testimony, if it is to be credited, is to prove that the appellants entered into a fraudulent conspiracy with the witness (Stuart) to cheat and impose

upon any person who might desire to purchase the hotel, and if a sale should be effected, he, Stuart, was to receive for his participation and assistance in the fraud, $2515,45 in rent due, and over $4000 worth of furniture belonging to the appellants; whose high character and reputation in the community for honesty and business integrity is shown by the evidence in the cause.

With regard to the testimony of this witness, we concur entirely in the opinion expressed by Judge HAYDEN, contained in the record, that it is wholly unreliable, and ought not to be considered in disposing of the case.

The decision of the Circuit Court was not based upon the testimony of Stuart, but rested on other grounds.

The majority, in disposing of the case, expressed no opinion as to the credibility of his testimony, considering it unnecessary in the view taken by them of the case, to go into that question.

The testimony if true, would conclusively establish the appellee's case. We have examined the evidence in the record most carefully, and are convinced that the testimony of this witness is not entitled to credence. Besides its intrinsic improbability, it is given by a witness whose story tends to discredit himself. His statements made in the course of his examination, are inconsistent and contradictory in themselves, and are expressly contradicted and discredited, not only by the testimony of Henry McShane, the appellant, with whom he professes to have had all his dealings, but also by several disinterested witnesses who have testified in the case. To point out these many inconsistencies and contradictions would extend this opinion to too great length. The result of our examination of the evidence in the cause, has convinced us that the several allegations of the bill, which had their origin in the first instance, in the representations made by Stuart to the appellee, and which rest entirely upon his statements, must be altogether disre-

garded as unsupported, and the case must be disposed of as if Stuart's testimony in this respect, was not in the record.

Treating the case in this way, we are to consider whether there is any sufficient ground or cause shown for annulling the contract, and cancelling the deeds executed by the parties. And *first* as to the alleged fraud, or imposition practiced on the appellee, with regard to the ownership of the furniture in the hotel. The evidence, shows that the parties dealt exclusively for the leasehold estate; the furniture in the hotel formed no part of the subject-matter of the contract. The proof shows that $1200 worth of it belonged to Stuart, put in by him when he leased the property, for the purpose of affording better security for the payment of the rent. The balance of it, worth over $4000, belonged to the appellants, was in the hotel when Stuart rented it, and left in the house under a separate contract made between the appellants and Stuart; he agreeing to pay for the use of it, and having the privilege of purchasing it. The fact that this contract was not disclosed to the appellee could give him no just cause of complaint, or furnish any ground for imputing fraud to the appellants, or impeaching the transaction. According to his own testimony, he made no inquiry about the ownership of the furniture, and there was no obligation on the part of the appellants to inform him. But in addition to this, it appears from the testimony both of White and Thomas, that the appellee was informed before the contract was made, that the furniture, most of it, belonged to the McShanes. Their testimony on this subject must be considered as counter-balancing that of the appellee, who no doubt testifies honestly according to his belief and recollection, but who without at all impeaching his integrity, may have failed to notice particularly, or to have remembered, what was said to him at that time about the ownership of the

furniture, as that did not enter into, or form any part of the property included in the exchange.

*Secondly.* As to the transaction which took place on the 8th day of April 1876, between the appellants and their tenant, Stuart, in which they accepted his note at four months to secure the payment of $2515.45, balance due them for rent, and gave him a receipt on the account, (complainants' exhibit No. 3, *ante p.* 111.) Some stress is laid on this in the bill of complaint, and it is charged that it was designed to deceive and impose upon the appellee, and induce him to believe the rent had been paid in money.

It is not alleged or suggested that he was actually deceived thereby, or ever saw the receipt before the delivery of the deeds. The evidence shows that he had no knowledge of its existence until the latter part of April, some weeks after the whole transaction had been consummated and the deeds delivered. Nor is there any thing in the settlement to justify any inference of fraudulent intent on the part of the appellants.

The property having been sold to the appellee on the 21st of March, and the possession thereof to be given at the beginning of April, rendered it necessary that the appellants should have a settlement with their tenant of his account for rent to that time. The evidence shows that this was made in good faith, and with the intention and expectation of exacting and receiving payment of the note.

*Third.* As to the lease referred to in agreement B, the theory of the complainant's case, and the substantial charge in the bill is that it was not a real, valid subsisting lease, but a mere sham and pretence. It is clearly shown by the proof that it was executed, in the first instance, in good faith; the appellants accepting Stuart as their tenant, only after careful inquiry as to his qualifications for the business, and his experience, and capacity to con-

duct the hotel, and with the best grounds for confidence in his compliance with his contracts; while he on his part, had the fullest confidence in his success in the undertaking. This relation between them continued unchanged to the time of their transaction with the appellee. Stuart had not paid his whole rent, but had paid it in part from time to time, had made a payment of $378,87 as late as January 1876: 'all the time holding out the promise and assurance to the appellants, of further payments, and of his ability eventually to pay in full. Under the circumstances it was not unreasonable that they should indulge him, and forbear to enforce his contract strictly.

The evidence of *Marcus Jones* the appellant's collector, who called on him in January and February for payment, shows that he continued to hold out the promise and assurance of his intention to pay in full, and always represented his business as prosperous, with flattering prospects of increased success during the "Centennial Year." There is no reliable proof that the appellants, or either of them knew the state of the hotel accounts, or the nature and extent of the business of the house. The statements of Stuart on this subject are contradicted by other testimony and are contradictory in themselves. There is no evidence, apart from the statements of Stuart which are contradicted and disproved by other evidence, by his own conduct and declarations, and by the facts and circumstances in the case, that the lease had been waived or abandoned, or that its terms had been in any respect changed or modified; but it was a valid and subsisting lease when the contract of the appellee was made, and to the time when it was assigned, and the tenant attorned to the appellee on the 13th day of April 1876. The charge made in the bill that it was not a valid, *bona fide* and subsisting lease, is not supported by the proof.

*Fourth.* We come now to consider the question. Were there any false or fraudulent representations made by the

appellants, or by their agent *White,* to the appellee whereby he was induced to enter into the contract and consummate the exchange? The bill alleges substantially that it was falsely represented to the appellee, that the hotel was in the occupancy of a tenant at the yearly rent of $5000, payable monthly, that he paid his rent punctually, and that the property was actually yielding that rental.

To support this allegation we are referred first to the contract "agreement B," which refers to the lease, and to the terms of the lease itself.

It is argued that this reference to the lease and its terms is *exceptional* in the contract, the other property, though occupied by tenants, not being referred to in that way, or the terms of their tenancy specified. As to this, it must be observed that the hotel was the only piece of property upon which there existed a lease for any particular period of time or duration; the other property being in the occupancy of tenants, temporarily only, as monthly or yearly tenants. The evidence shows that the true condition of the dwellings, as to the ground-rents to which they were subject, and the rates or amounts of rent payable by their several occupants, was fully disclosed; these particulars were, for obvious reasons, not necessary to be specified in the contract. But as regards the hotel, upon which there existed an outstanding lease, for five years, with the privilege to the tenant of renewal thereof and also of purchasing the property, it was eminently proper and necessary that this should be referred to and stated in the contract, to show the state of the title; without which the contract would have been imperfect and liable to be impeached; as was decided in *Edwards vs. Wickwar, L. R.,* 1 *Eq. Cases,* 68, and in *Cabellero vs. Henty, L. R.,* 9 *Ch. App.,* 447.

In these cases it was held, "it was the clear duty of the vendor to give the fullest information which he himself

possessed as to the title." So far from being "exceptional" in the contract before us, it was clearly the duty of the appellants to disclose the existence of the lease and its terms, and proper that it should be referred to· in the contract as showing the state of the title.

What then is the import and effect of this reference to the lease? Does it import, or amount to a declaration that the property was actually worth the rental stipulated for in the lease, or that the rent had been paid punctually? By no means; to give such a construction would be establishing a rule that would overthrow or defeat a great many fair and honest contracts of sale made between parties. We refer to the case of *Abbott vs. Suorder,* 4 *De G. & Sm.,* 448, 460, as conclusive on this question.

In our judgment there is nothing to be found in the contract of March 21st, to support the charge of false representations. The lease, as we have said, was a valid subsisting lease, it was truly described in the contract, and in the verbal communications to the appellee, preceding the contract. It is conceded in the argument and cannot be questioned that there was no duty or obligation resting upon the appellants, to disclose the state of accounts between them and their tenant, or to inform the appellee that Stuart had not paid his rent promptly. That was a matter outside of the contract, which the appellants were not bound to disclose; but it is said that having volunteered to make statements on that subject, they were bound to tell the truth, and a false representation in this respect, on which the appellee relied, and had a right to rely, and by which he was induced to enter into the contract to his injury, affords him good ground for setting it aside. This proposition is supported by authority, and we are not disposed to question it. We shall therefore next consider whether according to the proof there was any representation made by the appellants or their agent *White,* to the effect that Stuart had

McShane *vs.* Hazlehurst.

paid his rent punctually, or that the hotel was actually yielding and paying the rental reserved in the lease, and which deceived and misled the appellee, and operated to induce him to enter into the contract.

It is not pretended that any such misrepresentation was made by the appellants or either of them. The evidence shows that they and the appellee did not meet, or see each other during the negotiations that resulted in contracts "A and B;" nor had the appellee any interview with *White* the appellants' agent, until the time when contract "B" was concluded on. The complainant testifies that representations were made to him by *Thomas*, his agent and broker, that the hotel was occupied by a good tenant, who paid his rent punctually. But this representation cannot bind or effect the appellants, unless it were shown that it was derived by Thomas from them or their agent, and that he was authorized by them to make such statement to the appellee. This is not shown; White testifies that he made no such statement to Thomas; but stated to him only that there was a lease of the hotel, and its terms, that in point of fact he did not know whether Stuart had paid his rent punctually or not; his whole knowledge on the subject being that there was a lease calling for $5000 a year rent; and Thomas on his part says all the information he had from White was that the property was leasing for, or paying $5000 a year rent. It is evident from his testimony that he uses the words "leasing for" or "paying" as meaning the same thing. But if he really made the representations on that subject to the appellee, testified to by the latter, it is evident that he made them without the authority of *White*, but that they were prompted by his own zeal and anxiety to induce the appellee to enter into the contract.

The appellee in his answer to the fourth interrogatory says, "there were no representations, except those made by Mr. Thomas, directly to me in regard to Stuart."

Looking at the testimony of the appellee himself, the only thing to be found in it, connecting Mr. White with any representation, before "agreement B" was made, with regard to the rental, received from the hotel, is found in the appellee's answer to the 5th interrogatory. From this it appears that on the occasion when agreement B was about to be made, he met White in Thomas' office, and proceded to make a calculation of the revenue he might expect to derive from the hotel and other property which he was about to receive in exchange. He then set down the gross income from the hotel as $5000, and says "that *White then admitted it was a rent-paying lease* of $5000 *a year.*" White on the contrary in his testimony (answer to 3rd interrogatory,) in describing the interview at Thomas' office, and what then took place, states particularly that in making the estimate of the probable income from the property, the hotel was put down "as under lease for $5000," to the 5*th interrogatory* he says, "I referred to the lease as conveying the full facts in relation to the terms of Stuart's lease, setting forth that it recited the rate and the time, &c." "I *made no* other representations and was guarded all the time by reference to the lease for the facts in the case, both to Thomas and Hazlehurst," and to the 9th interrogatory, calling his attention to Mr. Hazlehurst's testimony, he answers, "I knew nothing about the paying; I never heard whether it paid or did not pay, all that I knew and all that I could have said, was to refer in all my statements to the paper, supposed to have been on record, as to the rental or lease or agreement to pay $5000 a year; for whether it had ever been paid or not I knew nothing about, and never made any statement to that effect."

Upon this state of the testimony, it is impossible to say that before "agreement B" was entered into, any false representations were made to the appellee, either by the appellants or by their agent White, directly or indirectly,

to the effect that Stuart had paid his rent punctually, or that the hotel was actually yielding and paying the rental of $5000 a year. In this respect the appellee has failed to establish the averments in his bill. Doubtless the appellee acted under the impression that Stuart was a good tenant, and paid his rent punctually. But this was an error on his part for which the appellants are not responsible; for neither they nor their agent led him into the error. In the language of COCKBURN, C. J., we must not "confound what was merely a motive operating on the buyer to induce him to buy, with one of the essential conditions of the contract." *Smith vs. Hughes, L. R.,* (6 *Q. B.,* 597.)

The only remaining ground insisted on in the argument to support the charge of misrepresentation is to be found in "*exhibit F*" filed with the answer, and produced before the com'r (marked complt's ex. C. S., No. 1.) This paper was made out in the office of Mr. Sprigg, the appellee's attorney, on the 7th day of April 1876, the day after the deeds were executed, and the same day on which they were delivered.

The paper contains a statement of water-rents, ground-rents and insurance on the property, and of the rents of the several parcels. Its object was to settle and equate the sums chargeable to each of the contracting parties, estimating the same to the 1st of April 1876, and it ascertained the amount payable by the appellants to the appellee, in final settlement, to be $1026.01, for which the appellants gave their check.

On that paper is the following item under the head of Rents, "*Hotel* $416.66 *paid* 1*st April.*" This item is now relied on by the appellee, as showing a false representation *then* made, that the sum of $416.66 the rent of the hotel for one month to April 1st, had been paid in cash, and it is contended that it affords ground for rescinding the transaction. This item is not referred to in the bill

of complaint, nor is the paper on which it was made; nor is it in any manner therein relied on, as a misrepresentation which misled the appellee. The paper was first introduced into the case as an *exhibit* with the answer. But long before that paper was prepared, the "agreement B," which was the binding and conclusive contract between the parties had been made and concluded; its validity could not be impeached, on the ground of any misrepresentation afterwards made. But looking to the character of the paper itself, and the purposes for which it was made, there appears to be no good ground for saying that the appellee was in any manner misled or deceived by the item referred to. It was designed simply to show that the rents of the hotel had been settled with the appellants to the 1st of April, and that from that date, the rents of that, as well as the other pieces of property, would be payable to the appellee. The entry appears to have been made by Mr. Sprigg, without any particular direction as to the form of the item, and without any other statement or direction having been made or given by Mr. McShane or Mr. White who were present, except to the effect, that the hotel rents were to be marked as settled with the appellants to that date.

Upon a careful consideration of the whole case, we are constrained to say, that the alleged frauds and misrepresentations have not, nor have any of them been established by the proof.

But in addition to this, we think the testimony shows, and no part of it more clearly than that of the appellee himself, that as it regarded the value of the property, and the ability of Stuart, the appellee did not rely upon any representations either of White or Thomas; but in those respects chose to be his own judge, and to examine and inquire for himself, which his testimony shows he did most carefully and fully.

After "*agreement A*" had been set aside by him, he visited the hotel and examined it thoroughly on two occa-

·sions; inquired of Stuart as to his ability to live up to his lease, and relied on his statements in that respect, Stuart being known to him "as a man who had been long ·engaged in that business, and who, he presumed, was experienced and capable;" and after the fullest inquiry ·and investigation, was satisfied with the property.

He then proceeded to enter into "*agreement B,*" which differed from "*agreement A*" in some particulars, himself making the alterations, and presenting it as a proposition on his part, which was accepted by the appellants, and ·constituted the final and binding contract between them, ·and was afterwards deliberately carried into execution.

We do not enter into any inquiry as to the relative value of the properties, which formed the subject of exchange. There is a good deal of testimony on this sub-.ject, much of it conflicting. This is a question with which we have nothing to do, the appellee cannot be relieved from his contract, merely because he may have made a bad bargain. The contract having been deliberately ·made and carried into execution, cannot be rescinded or set aside at the instance of the·appellee, except upon the ·clearest and most satisfactory proof.

The evidence in this case has failed to establish any fraud on the part of the appellants, or to prove that either they or their agent resorted to any artifice or misrepre-·sentations to delude or deceive the appellee.

The decree of the Circuit Court must be reversed an'd the bill dismissed.

> *Decree reversed, and*
> *bill dismissed.*

(Decided 13th December, 1878.)


ALVEY and ROBINSON, J., dissented, and the former filed ·the following dissenting opinion:

In regard to the legal principles announced in the ·opinion of the majority of the Court I entirely agree; but

as to the conclusion from the facts of the case, I must dissent. I cannot resist the conviction that the facts show such a degree of deception of the appellee as to entitle him to relief from the contract, even according to the most stringent legal rules for which the appellants have contended; and I therefore think the decree appealed from should be affirmed.