STRAUS et al. *v.* MADDEN

[No. 196, September Term, 1958.]

*Decided April 16, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John D. Gilmore, Jr.,* with whom were *Conroy, Williams, Nylen & Gilmore* and *M. J. Cuff* on the brief, for the appellants.

*John I. Heise, Jr.,* with whom was *Murdaugh S. Madden* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The trial court entered a decree for the rescission of a transaction or series of transactions between Bartholomew Properties, Inc. ("the Company") and Ralph D. Rocks (sometimes referred to below as "the Purchaser") and his nominees or straw parties, the defendants Justine A. Straus and Dorothy M. Parkison. The suit was originally brought on July 15, 1957, by Margaret L. Madden, a minority stockholder of the Company, against the Company, Orlo A. Bartholomew, the President and a Director of the Company, and Beulah Bartholomew (wife of Orlo A.), the Secretary and a Director of the Company, and sought the appointment of a receiver for the Company and kindred relief on the grounds of fraud and mismanagement. The bill was subsequently amended so as

to join Straus and Parkison as parties and to seek relief by rescission and cancellation. Rocks was not joined as a defendant, but he testified as a witness and stated that he was the real party in interest in the case and that Straus and Parkison were his straw parties. He appears to have assumed and controlled the defense of the case. A demurrer filed by Straus and Parkison did not present as one of its grounds the non-joinder of Rocks, and we shall not consider further in this opinion any such objection which might have been raised, nor do we express any view as to its validity, if it had been raised. Straus and Parkison are the appellants of record.

The Company, which was organized in May, 1954, acquired as actually or practically its only asset, a tract of 30.33 acres of land at the northwest corner of the intersection of the Baltimore-Washington Parkway and Riverdale Road, in Prince George's County. Apparently, most of its authorized stock was issued for this property, which was conveyed to the Company by Orlo A. and Beulah Bartholomew. 188 shares, out of an authorized 1500 shares, of the par value of $100 per share, were issued to the plaintiff for cash. Their validity is not challenged, nor is the validity of the issuance of other shares involved on this appeal, though the record may suggest some questions. The Bartholomews seem to have run the Company as if they owned it—which was far from the fact. It would be difficult to imagine a corporation whose affairs were conducted with less regard for proper corporate procedure.

The transaction or transactions involved in this appeal resulted in the execution of the following documents: (1) a contract of sale dated June 14, 1957, between the Company as vendor and Rocks as purchaser, covering seven acres of the above tract, and a collateral so-called guaranty by Rocks; (2) a deed of trust dated July 1, 1957, from the Company to John M. Conroy and John D. Gilmore, Jr., as Trustees, to secure an alleged indebtedness of $75,000 to Dorothy M. Parkison; (3) a promissory note of the Company for $75,000, payable to Dorothy M. Parkison, dated July 1, 1957, secured by the deed of trust of the same date; (4) an escrow agree-

ment, also dated July 1, 1957, between the Company, Rocks, and Edward W. Nylen and John D. Gilmore, Jr., as Trustees;[1] (5) a deed dated July 3, 1957, from the Company to Justine A. Straus and Dorothy M. Parkison conveying the seven-acre tract referred to in the contract of sale dated June 14, 1957.

The 30.33 acre tract is somewhat irregularly shaped. It has a total frontage of about 2287½ feet along the right of way of the Expressway, of about 452½ feet on Riverdale Road, and of just under 2100 feet on 64th Street. At the northwest corner of the tract is what may be called a sac having a frontage of about 491 feet on Brier Boulevard, which runs off at an angle of about 125 degrees from the north end of 64th Street. The northern line of the property from the Parkway to the sac runs southwesterly from the Parkway at an angle of about 70 degrees for approximately 842½ feet. The northerly 20 acres of the tract were so zoned as to permit motel use; the southerly ten acres were zoned only for residential use. The seven acres covered by the contract of sale of June 14th and by the deed of July 3, 1957, form a parallelogram lying in the twenty-acre area where motel use is permitted and are in the northeast corner of the whole 30.33 acre tract and have a frontage of 800 feet on the Expressway. An appraiser, Mr. Dunn, called by the plaintiff, valued the twenty acres of land zoned to permit motel use at $8,000 an acre, or $160,000, and the remaining ten acres, zoned residential, at $4,000 an acre, or $40,000.

In addition to the seven acre tract, the Purchaser was to acquire a 26-foot right of way along the Expressway frontage from the seven acre tract to Riverdale Road, a distance of nearly 1500 feet. Under the deed of July 3, an exclusive right of way was granted to the Purchaser's nominees.

At the start of the conference of June 14, 1957, at the end of which the contract of sale of that date was executed, Rocks

---

1. These trustees were not joined as defendants. They are members of the law firm which represents Mr. Rocks. No point is made of their non-joinder. The same observations may be made as to the trustees under the escrow agreement.

had made what was represented as an offer of $200,000 for the whole 30.33 acres. In fact, the making of such an offer was a condition to the calling of the conference. One-half of the consideration was to be represented by five acres of land in Prince George's County zoned as commercial. This offer was neither accepted nor rejected. The Bartholomews' friend and adviser, Judge J. Warren Madden of the U. S. Court of Claims, attended the conference with the Bartholomews and was also a representative of the plaintiff as a minority stockholder. Also present were Mr. Rocks, his attorney, Mr. M. J. Cuff, Mr. Casey, a real estate salesman employed by B. F. Saul Company, brokers (who had been employed by the Company to sell part or all of its property under a non-exclusive agency) and, at times, a Mr. Lawler, an employee of Rocks. Judge Madden expressed disappointment at the amount of the offer (which only matched the amount of a conditional offer received by the Company in November, 1955, and fell $100,000 short of that offer, if a zoning change could have been obtained), and he also stated his inability to value the property offered in exchange. The conference began at or after 4 P. M. and Judge Madden left at 6 P. M., with no agreement made or in sight on the $200,000 offer, and no other proposition before the meeting.

After Judge Madden left, the Bartholomews remained and agreed, in the name of the Company, to sell the seven acres, to give the Purchaser the 26-foot right of way above mentioned, and to permit him to put up a sign for his motel in the southeast corner of the 30 acre tract, and further covenanted not to permit the use of any of the remaining 23 acres for a motel. The consideration moving to the Company was to be $30,000 made up as follows: (1) cash at or before settlement, $2,500 ($1,000 of which was paid as a deposit); (2) $12,131 through the assumption by the Purchaser of 7/30 of the first trust on the property of $52,000, conditioned upon an arrangement satisfactory to the Purchaser and to the holder of the note securing the first trust being made; (3) the transfer of notes, or the proceeds thereof, of a construction company secured by deeds of trust in the aggregate principal amount of $15,099 (plus, apparently, $270 accrued

interest on one of the notes). By a separate instrument Rocks "guaranteed" payment of these notes, but not as to the time of payment. (Just what that guaranty meant is not wholly clear.)

Mr. Dunn found that land worth $56,000 (7 acres @ $8,000) was thus sold for $30,000, that the remaining 13 acres which could have been used for motel purposes were reduced in value from $8,000 to $4,000 an acre, a loss of $52,000. He made no allowance for depreciation in the value of the balance of the tract due to the right of way being made exclusive. Simply on his figures, the Company sold nearly one-fourth of its total acreage for approximately one-seventh of the value of the entire tract, the seven acres were sold for 30/56, or approximately 54%, of their value, and the value of what the Company had left was $92,000 (13 acres plus 10 acres @ $4,000) instead of $144,000, or approximately 70%. If we add together the supposed value of the consideration received ($30,000) and the value of the remaining twenty-three acres ($92,000) we have a total of $122,000. If we then deduct $3,000 for the roughly ¾ of an acre to be occupied by the right of way (without any allowance for the damage which the exclusive right of way would do to the balance of the property), and another $3,000 for the 10% commission on $30,000 to be paid to the real estate broker for effecting the sale, we find that the Company comes out with remaining gross assets of $116,000 as against the original $200,000. Since it still has liabilities of $61,000 on the first and second trusts, its net worth is $55,000 as against $139,000 before these transactions began. In short, on the above figures, for a consideration of $30,000, the Company has parted with property, suffered a decline in value of remaining property, or incurred liability, in the aggregate amount of $114,000. This results in a net decrease in its worth of $84,000, or of 60% of its net worth. We think it clear that the consideration moving to the Company was grossly inadequate.

We have carefully considered the lower values stated in testimony of the appraisers called by the defendants. One valued the tract at $4,000 or $4,500 an acre; the other at $5,000 an acre. Each ascribed an overall acreage value to the

entire tract and made no distinction in value between that part which could be, and that which could not be, used for motel purposes. Rocks himself was well aware of the greater value of the motel use part of the tract. Clause 15 of the June 14 agreement which prohibits the construction or operation of a motel on the parcel retained by the Company states: "it being expressly understood that the inducement to the Vendee [Rocks] to enter into this contract is the *value of the seven (7) acre tract * * * for use as a motel site.*" (Italics supplied.) We think that in reaching his conclusion that the transaction was "unconscionable", the Chancellor accepted the view of Mr. Dunn and of Mr. Rocks that there was a material difference in value based upon this factor; and we find nothing in the evidence which would lead us to disagree with him on this question of fact—still less to hold that his finding based upon testimony as to valuation was "clearly erroneous", to use the words of our Rule 886.

The Chancellor found: (i) that the officers of the Company who acted in this matter were without authority to make the conveyance of the seven acres, (ii) that "pressure, duress, coercion and misrepresentation [were] practiced by the Purchaser" upon the Bartholomews who were acting as officers of the Company in this transaction and (iii) "that this transaction was unconscionable." As presented in this Court, the case has been argued under each of these three general headings separately. We find it unnecessary to pursue the first two problems to final and separate solutions. Instead, we think that the facts which give rise to the contentions that corporate authority was lacking or that pressure, coercion, duress and misrepresentation were employed, may better be considered in conjunction with the inadequacy of price. The latter, we think, was established.

It is, of course, true as a general rule that mere inadequacy of price will not of itself be sufficient to warrant the rescission of a contract or the refusal of the remedy of specific performance. One cannot be relieved of a contract merely because he may have made a bad bargain. *Shepherd v. Bevin,* 9 Gill 32; *McShane v. Hazlehurst,* 50 Md. 107; *Lawson v. Mullinix,* 104 Md. 156, 64 A. 938; *Vincent v. Palmer,* 179 Md.

365, 19 A. 2d 183; *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 37 A. 2d 305; *Great United Realty Co. v. Lewis,* 203 Md. 442, 101 A. 2d 881.

On the other hand, in the *Great United Realty Co.* case, it is stated that "a contract between competent parties cannot be rescinded by either party without an option to do so or without the other party's consent, in the absence of fraud, duress, or undue influence, or unless the equities are such that the other party should not be permitted to enforce the contract." (203 Md. 450).

In *Kappelman v. Bowie,* 201 Md. 86, 93 A. 2d 266, inadequacy of price and unilateral mistake, induced in part by the sellers' real estate agent, were held a valid defense against a suit for specific performance by the buyer. The sellers were persons of little education or business experience.

In *Baltimore v. De Luca-Davis Co.,* 210 Md. 518, 124 A. 2d 557, an experienced contractor was held entitled to rescission of a contract where, as a result of the contractor's error in arithmetic, it submitted the low bid on a municipal construction job, and the price bid was greatly inadequate.

Little would be gained by the citation of many authorities. We believe that the law is as indicated in the *Great United Realty Co.* case, *supra,* and as stated in Pomeroy, *Equity Jurisprudence,* 5th Ed., § 928. In that Section at pp. 639-641, the author says: "If there is nothing but mere inadequacy of price, the case must be extreme, in order to call for the interposition of equity. Where the inadequacy does not thus stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted. But even here the courts have established clearly marked limitations upon the exercise of their remedial functions, which should be carefully observed. The fact that a conveyance or other transaction was made without professional advice or consultation with friends, and was improvident, even coupled with an inadequacy of price, is not of itself a sufficient ground for relief, provided the parties were both able to judge and act independently, and did act upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstance of oppression. When the accom-

panying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative."

In support of the text, the author cites (among many cases) *Warren Mfg. Co. v. Baltimore,* 119 Md. 188, 86 A. 502, a case which involved both inadequacy of consideration and misrepresentations.

In accord with the law as stated by Pomeroy, see also Story, *Equity Jurisprudence* (14th Ed.), §§ 351-358; Black, *Rescission and Cancellation* (2nd Ed.), §§ 169-173; 9 Am. Jur., *Cancellation of Instruments* § 25, pp. 371-372; Anno., L. R. A. 1916 D, 382; 12 C. J. S. *Cancellation of Instruments* § 23, pp. 970-971.

Let us now look briefly at some of the facts, in addition to inadequacy of consideration, which, we think, are shown by or deducible from the evidence, and which seem pertinent to the question of whether or not the transaction or transactions were inequitable.

Orlo A. Bartholomew was a seriously ill man throughout the transaction or transactions here involved, which occurred in June and July, 1957. He died in October, 1957. His wife acted in accordance with his wishes. On July 3, 1957, one of the critical dates, she, too, was ill.

Throughout this period the Bartholomews were in desperate need of cash. This fact was made clear at the conference of June 14 and was well known to Mr. Rocks and his representatives. It takes no stretch of the imagination to believe that the Purchaser anticipated that the small amounts of cash paid to the Company would go quickly and largely to meet the personal needs of the Bartholomews, as they did. It is quite evident that Rocks knew that the $1,000 paid in June had not been used to pay accrued interest of the first trust. Rocks permitted this amount ($523.04) to be paid to the Company on July 5, though under the terms of the settlement sheet the Company was not entitled to it. It made up

more than half of the $1,000 which Bartholomew demanded in cash.   (He got a total of $977.75.)

The agreement of June 14 was negotiated and signed without the presence or knowledge of the Bartholomews' trusted adviser, and he was not consulted at all about it before it was signed.

The Bartholomews were not dealing for themselves alone. They were dealing for the Company. Judge Madden's testimony is that at the June 14 conference Mr. Rocks was informed that there was (at least) a minority stockholder. Also, at some stage of proceedings—not later than July 1—Mr. Cuff knew that such stock of the Company as the Bartholomews owned was pledged to Judge Madden as security for a debt.

The disastrous nature of the transactions to the Company must have been apparent to Rocks and his representatives, just as the advantages to Rocks were apparent. The Bartholomews were known to Rocks and his representatives to be officers of the Company and hence to owe fiduciary duties to the Company and its stockholders. It could hardly have been supposed that they were discharging them properly, even if it be assumed that this kind of a transaction seriously and adversely affecting the Company's sole asset, the 30 acre tract, could be handled by the officers without specific authority from the board of directors.

Evidently Mr. Rocks' attorney had some question as to the extent of the authority of the officers to bind the Company, for he inserted in the deed of trust of July 1, 1957, a recital to the effect that the instrument was executed "in pursuance of resolutions duly adopted for that purpose by its Stockholders and Board of Directors, respectively" and he added to the deed of July 3, 1957, a certification "that the foregoing Deed was duly executed and delivered pursuant to the provisions of a resolution of the Board of Directors and Stockholders of the aforesaid Corporation, passed at a regularly called meeting of the said Board of Directors and Stockholders at which a quorum was present." The evidence, we think, warrants the conclusion that Mr. Rocks' counsel, Mr. Cuff, knew the above recital and certification which were to

be executed and were executed by one or both of the Bartholomews as Company officers to be untrue at the times of their execution.

The deed of trust of July 1, 1957, and the $75,000 note thereby secured and the escrow agreement of the same date were represented to the Bartholomews as being for their protection and (presumably) that of the Company. These representations were made by Mr. Casey [2] and by Mr. Cuff. These instruments were drafted after Mr. Nash, the holder of the note secured by the first trust, had flatly refused to release the seven-acre tract from the lien of the first deed of trust and had declined to commit himself by letter to grant any extension of the time for payment. The execution of these documents was plainly for the protection of Rocks after he was unable to work out an arrangement with Nash. Any legal protection to the Company escapes our discernment.

Under these documents Rocks could, if he chose, put up money to cover principal or interest, or instalments thereof, or foreclosure costs, under either the Nash first trust or the Madden second trust, if it became "necessary to the quiet enjoyment of the 7 acre parcel conveyed by * * * [the Company] to * * * Rocks, including the right-of-way, right to erect a sign and covenant relative to competition on the adjoining parcel as set forth in * * * an Agreement of Purchase and Sale * * * between * * * [the Company] and * * * Rocks dated June 14, 1957, * * *." If he made such advances, he would be protected under the deed of trust of July 1, 1957; but there was no legal obligation on Rocks to make any such advance. He was perfectly free, if he chose, to let either or both trusts be foreclosed (and to bid at the foreclosure sale), or he might step in, make payments and be protected under the July 1, 1957, deed of trust. The option was his, and he was not compelled to do either. The most

---

2. Mr. Casey's concept of his duties was revealed with perhaps unwitting clarity when he testified that at real estate settlements, it was his practice to look at the settlement sheets "because [his] Company is involved in the settlement sheet and also as representing the seller and purchaser."

that he was obligated for in connection with either the first or second trust was the payment of $12,131, being 7/30 of the $52,000 first trust, and presumably interest thereon. When and how this was to be paid is not stated. It was not paid to the escrow agents or to any one else and remained simply a liability of Rocks. Whatever obligation there was originated under the agreement of June 14. It was then subject to a condition which Rocks later waived. It was shown as an amount credited against the purchase price to the unnamed purchaser on the settlement sheet of July 3rd, which settlement sheet was not signed by or on behalf of anyone as purchaser. We shall assume for present purposes that under *Rosenthal v. Heft,* 155 Md. 410, 142 A. 598, Rocks was liable to pay this part of the first trust.

Quite possibly Rocks might have found it to his own advantage to avoid foreclosure of either of the prior liens, but whether he would or would not do so was left entirely to his choice as and when occasion to make such a choice might arise. In this connection it may be noted that no part of the proceeds of the notes constituting a part of the consideration payable to the Company under the June 14 agreement which were to be deposited under the escrow agreement was to be paid to the Company until the Madden second trust should have been subordinated to the conveyance to Rocks of the seven acre tract, including the right of way, of the right to maintain a sign and "the covenant relative to competition" set forth in the agreement of June 14. The agreement of June 14 contained no comparable provision.

In addition, or rather before reaching this point, the escrow agreement provided that the proceeds of the above notes [which were backed, or may have been backed, by Rocks' peculiar "guaranty" of payment at some unspecified time] coming into the hands of the trustees under the escrow agreement should be applied (a) to the principal or interest then in default under the first or second trust, (b) if an agreement should be reached by the Company and Rocks with the holder of the first trust note, any amounts necessary to curtail the amount due thereon and any premium required for renewal thereunder, and (c) to the payment of the real estate

agent's commission under the agreement of June 14. After these items were taken care of the balance was to be payable by the trustees to the Company and to Rocks "in proportion to their interest as specified in the Agreement of June 14, 1957." (How Rocks would have been entitled to any part of the fund is not readily apparent.) Even the payment of any part of this balance to the Company was, as already stated, to be subject to the proviso that the Madden second trust should first be subordinated to the conveyance to Rocks.

It may also be noted that not one cent was paid or advanced to the Company under the July 1 deed of trust to secure $75,000, but this instrument was recorded on July 8, 1957, just before the deed of July 3.

We cannot think that the July 1, 1957, deed of trust and escrow agreement afforded any real protection to the Company. To assert that they did so amounted to a misrepresentation to people who were in no condition either mentally or financially to bargain on even terms.

To make matters worse, Mr. Rocks' representative (aided by the real estate agent who should have been loyal to his employer) was rushing the Bartholomews into the execution of the documents of July 1 and the deed of July 3. In connection with the latter, Mr. Cuff refused a requested delay over the Fourth of July weekend to permit the Bartholomews to consult the Company's counsel; and the pressure, including threats of suit by Cuff and Casey, was heavy to get the documents executed and on record before Judge Madden could interfere by suit or otherwise with the consummation of the folly on the part of the Company contemplated under the agreement of June 14.

And as if all of that were not enough, the deed of July 3, drawn by Mr. Rocks' counsel, provided for the grant of an *exclusive* right of way, not simply *a* right of way, as provided by the agreement of June 14.

It would be idle to prolong this opinion further. We think that there is ample evidence of gross inadequacy of consideration, plus accompanying inequitable incidents that show bad faith. (See Pomeroy, *op. cit.*, § 928.) These incidents include misrepresentation as to "protection" of the seller, un-

due advantage and oppression on the part or on behalf of the buyer, including the exertion of pressure on the Company's officers to go through with transactions so clearly disastrous to the seller as to point to at least connivance by the Purchaser in the officers' breach of their fiduciary obligations towards the Company and its stockholders.[3] The sickness and pecuniary necessities of those who undertook to act for the Company and their inability to bargain on even terms were apparent. In our opinion, the Chancellor was clearly warranted in finding this transaction or series of transactions to be unconscionable and such that a court of equity should not permit them to stand, and in ordering the rescission thereof, with the return to the Purchaser of such considerations as the seller Company had received under the transaction or series of transactions.

> *Decree affirmed, the costs of this appeal to be paid by the appellants.*

---

3. The doctrine of apparent authority, which seems to be the foundation of the appellant's argument based upon the authority of the president, applies (if at all) to acts done in the ordinary course of business and in favor of one who acts in good faith. See Brune, *Maryland Corporation Law*, (Rev. Ed.), § 232, p. 233. Cf. Code (1957), Art. 23, § 60. Without discussing what was the ordinary business of this corporation, we think that the Purchaser does not meet the test of good faith.