## BROWN *v.* BROWN

[No. 672, September Term, 1966.]

140

*Decided December 5, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*Stanford Hoff,* with whom was *E. Austin James* on the brief,
for appellant.

No brief and no appearance for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

This dreary feud began nearly 20 years ago and except for
a few short periods of relative tranquility it has been pressed
with seeming relish ever since. By virtue of its visit to this
Court in 1952 (*Brown v. Brown,* 199 Md. 585, 87 A. 2d 626)
and again in 1954 (*Brown v. Brown,* 204 Md. 197, 103 A. 2d
856) it now has a clear title to the status of unwelcome visitor.
The present, and we hope final, skirmish arises out of an agree-
ment made in May 1957. It recites the "protracted separation
[since 1950] between the parties," the desire of the appellee
(Brown) "to reestablish the * * * marriage and to resume the
marital relationship" and "to provide for the security of" the ap-
pellant (Edith). In consideration of Edith's willingness "to con-
done all [of his] past acts" and "to reestablish and resume their
marital relationship" Brown agreed to transfer the real estate
standing in his name alone to Edith and himself as tenants by
the entireties, to assign to Edith 51% of the stock of Brown's
Amusements, Inc., 50% of his stock in Potomac Diner, Inc.
and Park Drive Inn, Inc., to discharge all existing income tax
obligations, and to allow Edith to operate and manage, jointly

with himself, Brown's Amusements, Inc., he to continue to operate and manage Potomac Diner and Park Drive Inn.

The reconciliation lasted about 9 months. Hostilities were resumed in March 1958 when Edith packed up and left the marital domicile for the second time. In March 1960 she filed a bill for a divorce in Frederick County alleging adultery. From time to time testimony was taken before an examiner but the case was never concluded. Edith eventually dismissed it. In February 1963 she filed another bill for a divorce, this time alleging voluntary separation. More testimony was produced and, on 5 April 1963, the chancellor granted a divorce a vinculo but held all other matters sub curia. Twenty-eight months later there was a hearing before the court auditor. After another year went by there were two more hearings, a week apart. Seven months later the chancellor signed the order from which this appeal was taken. The opinion and order of the chancellor dealt with a number of items but we shall discuss only those which have been challenged in Edith's brief. There was no brief and no appearance for Brown.

## I.

Edith's first contention arises out of Brown's failure to comply with the provision in the agreement relating to the assignment of stock in 3 corporations. The chancellor was "of the opinion that an equity court under its divorce jurisdiction" is without authority to determine the "ownership of shares of stock in a corporation or corporations which no longer exist and as a remedy therefor decree money damages." Accordingly he held Edith "must assert her claim * * * in some action other than this divorce proceeding."

What happened in connection with the stock was certainly extraordinary. Some months after the reconciliation agreement Brown gave Edith the certificate for 74 shares of the stock of Brown's Amusements, Inc., standing in his own name. The assignment form on the reverse side had been completed, on a typewriter, to show the assignment to Edith of 51 of the shares represented by the certificate. Just before he handed over the certificate Brown struck out 51 with a pen and changed it to 50. The assignment was dated and Brown's signature was witnessed. There was testimony that the total stock issued and out-

142

standing was 100 shares. No transfer to Edith was ever made in the corporate records and she testified Brown refused to issue a new certificate in her name. She said during the nine months they lived together he consulted her "a couple of times" about the operation of the business. After that she was not allowed to have anything to do with its management. In 1962 a part of the business was sold to Edith's brother for $10,000. He paid Brown $4,000 in cash and gave a note for the $6,000 balance which was paid in full during the following year. Brown insisted that the corporation received this money but he was unable to point to any evidence of it in the corporation books or records. When Edith's counsel suggested that he had pocketed the money instead of depositing it in the corporation account Brown took umbrage, said he was being called a thief and declared he was "more of a man than" counsel. Order was restored by the auditor. Later on, it developed, the rest of the business was sold to Eyler's Vending Service for $20,000, $13,000 of which was represented by a note. In December 1964 all of the assets (including the note) of Brown's Amusements, Inc. ($20,240.72) were distributed to Brown, his brother and his father. Edith received nothing.

Brown steadfastly refused to transfer to Edith 50% of his stock in Potomac Diner, Inc. He admitted, however, that he received a $70 quarterly dividend in 1962. Edith claims he received like amounts between 22 May 1957 and 9 December 1966 (the date of the decision in the court below). These dividends, she says, amounted to $2,450 and as the owner of 50 of Brown's 98 shares she is entitled to $1,225 and a stock certificate for one-half of his stock.

Brown gave Edith his certificate for 98 shares of the stock of Park Restaurant of Frederick, Inc. (Park Drive Inn, Inc. in the agreement). The form on the reverse side was filled in to indicate the assignment of 50 shares to Edith. The corporate records do not reflect such an assignment nor was a certificate ever issued to her for the 50 shares. Brown testified "the place was tore down" and that "there wasn't anything whatsoever left and nothing whatsoever as far as the Park Drive Inn is concerned, it is not as good as the paper it is written on." In-

deed Edith's counsel, in the brief, seems to concede that Park Drive Inn, Inc. is "defunct."

The chancellor felt that *Brucker v. Benson,* 209 Md. 247, 121 A. 2d 230 (1956), is controlling. We see differences between *Brucker* and the case at bar which lead us to a contrary conclusion. In *Brucker* the wife sought a monetary decree for $3,500 as "her share of mutual personal property." There was no agreement between the parties such as there is here. She alleged that during the period in question she contributed toward the purchase of the personal property about $9,500 and that the husband's contribution during the same period was $11,200. Chief Judge Brune, who wrote for the Court, after quoting Code, Art. 16, § 38 (1951) (now § 29 [1]), pointed out that the wife:

> "* * * does not seek by her petition as filed to establish her ownership of, or claim to, personal property, nor does she seek the sale of any such property in order that the proceeds thereof may be divided. She seeks money—not tangible property—and she seeks it in an amount which she says is equivalent to her total contributions to a matrimonial, pooled fund used to buy personal property." *Id.* at 251.

Judge Brune went on to note that the charging of the former husband with the full amount of her contributions to the fund which may have been applied to the purchase of personal property, regardless of the present ownership, value, or even existence, of such property would, (he said) :

> "* * * upon divorce, convert all of her alleged contributions towards the personal property fund into demand deposits, repayable by the husband." *Id.* at 252.

---

1. "Whenever a court shall grant a divorce a mensa et thoro or a divorce a vinculo matrimonii, it shall have the power to hear and determine all questions which may arise between the parties to such proceeding in connection with the ownership of personal property (except chattels real) held, possessed or claimed by either or both of them, and shall have the power to make a division of such property between them, or order a sale thereof and a division of the proceeds of such sale, or make such other disposition thereof as the court may deem proper."

He noted her failure to take any depreciation into account. He adverted to the fact that her petition ignored the presumption of a gift and the impact on her claim of the interest she acquired in the jointly held real estate. He also characterized her evidence as "both scanty and very indefinite."

In the case before us Edith is not trying to establish her ownership of the stock. She became the undisputed equitable owner of the stock by virtue of the agreement in which it is described as her "sole and separate property." She is seeking not the sale but the possession of it. In paragraph 3 of the prayer for relief in the bill of complaint she asks not only for "a division of the personal property" but also for the specific enforcement of "the provisions of" the agreement, which was attached to the bill and filed as an exhibit.

We think the agreement, to use the language of the statute, is "valid, binding and enforceable to every intent and purpose" in this divorce action. Code, Art. 16, § 28 [2] (1966, Repl. Vol.). In *Grossman v. Grossman*, 234 Md. 139, 145, 198 A. 2d 260 (1964), where the divorce granted below was reversed, we held that an offer of reconciliation wrongfully refused did not vitiate a prior separation agreement and that it was valid and enforceable. Speaking for the Court, Judge Marbury said:

> "We have, of course, long recognized the validity of such agreements, and a statute specifically so provides.

2. "Any deed or agreement made between husband and wife respecting support, maintenance, property rights, or personal rights, or any settlement made in lieu of support, maintenance, property rights or personal rights shall be valid, binding and enforceable to every intent and purpose, and such deed or agreement shall not be a bar to an action for divorce, either a vinculo matrimonii or a mensa et thoro, as the case may be, whether the cause for divorce existed at the time or arose prior or subsequent to the time of the execution of said deed or agreement, or whether at the time of making such deed or agreement the parties were living together or apart; provided, that whenever any such deed or agreement shall make provision for or in any manner affect the care, custody, education or maintenance of any infant child or children of the parties the court shall have the right to modify such deed or agreement in respect to such infants as to the court may seem proper, looking always to the best interests of such infants."

Code (1957), Article 16, Section 28, and see generally, Myerberg, *The Practical Aspects of Divorce Practice* (2d ed.), Chapter VII, especially page 86."

That relief eventually may come to Edith in the form of a money judgment against Brown does not seem to us to be sufficient reason for denying jurisdiction. After all, the situation was not of her making. It arises solely out of Brown's wrongful dispersal of the corporate assets and his failure to comply with the obligation he assumed in the agreement.

Edith is clearly entitled to receive from Brown a certificate for one-half of his stock in Potomac Diner, Inc. She is entitled also to one-half of whatever dividends he may have received between 22 May 1957 and 9 December 1966. The chancellor, in his opinion, said, "Potomac Diner, Inc., was sold, no sale date being given in the testimony." If that is true (there seems to be no testimony to that effect) then, upon remand, Edith's rights in that regard must be given further consideration.

The case will be remanded for the reception of whatever testimony may be necessary for the determination of the facts and circumstances associated with the sale of the assets of Brown's Amusements, Inc., their dissipation, distribution and present whereabouts. A similar inquiry may be necessary in respect of Potomac Diner, Inc. The chancellor will pass an order calculated to provide Edith with whatever relief may be consistent with the facts developed at the hearing and which may be practically available at the time.

In light of what has been said in respect of the Park Drive Inn, Inc., stock, further inquiry in this regard probably will be unnecessary.

Brown's claim that he was drunk when he delivered his two stock certificates to Edith cannot be taken seriously. He admitted he was represented by counsel and that counsel was present. We think his answer to one question on cross-examination disposes of his claim:

"Q. Well, you weren't so drunk that you couldn't strike out the "1" and make it 50 shares instead of 51 shares, were you?
"A. No, I wasn't that drunk."

## II.

The accounting between the parties in respect of the collection of rents by each of them from the jointly owned properties gives rise to Edith's second contention. Sweeping aside the many details involved it comes down to the question whether Edith is entitled to receive half of the rental value of the apartment occupied by Brown during the 5 years following the separation in March 1958. She relies on *Whitelock v. Whitelock,* 156 Md. 115, 143 Atl. 712 (1928), *Collier v. Collier,* 182 Md. 82, 32 A. 2d 469 (1943), *Elko v. Elko,* 187 Md. 161, 49 A. 2d 441 (1946) and *Brown v. Brown,* 204 Md. 197, 103 A. 2d 856 (1954), but all of those cases are clearly distinguishable. Cf. *Howard v. Howard,* 245 Md. 182, 225 A. 2d 456 (1967). Oddly enough, it does seem that we have not heretofore considered the precise question Edith now presents. The chancellor held that "either or both had the right to occupy it, and * * * [Brown] will not be chargeable with any rent to * * * [Edith] for his occupancy." We agree.

Our predecessors many years ago adopted Baron Parke's statement in *Henderson v. Eason,* 9 Eng. L. & Eq. Rep. 337, 341 (1851). He said:

> "* * * if a dwelling house or room is solely occupied by one tenant in common without ousting the other * * * it would be most inequitable to hold that by the simple act of occupation or user, without any agreement, he should be liable to pay a rent or any thing in the nature of compensation to his cotenant for that occupation, to which, to the full extent to which he enjoyed, he had a perfect right."

*Israel v. Israel,* 30 Md. 120 (1869), *Meyers v. Loan & Sav. Assn.,* 139 Md. 607, 116 Atl. 453 (1922).

Since a tenancy by the entireties is much less discrete than a tenancy in common, there seems to be no reason why the rule enunciated by Baron Parke should not be superimposed on this particular tenancy by the entireties. To the same effect see *Stevens v. Stevens,* 22 Pa. D. & C. 696 (1935) and *Weiner v. Weiner,* 68 Pa. D. & C. 51 (1949). While we express no opinion in respect of its relevancy or significance we do observe that there is no evidence of ouster in the case at bar.

### III.

A question presented only indirectly involves Edith's right to deduct from the rentals she collected about $1,600 she claims were college expenses for one of her two daughters. The testimony in this regard is far from satisfactory. The expenditures were not itemized and it is clear that at least some of them were for clothes, automobile tires and other things not directly concerned with education. Brown testified that he "sent her to college [University of Miami] and was going to continue to send her until * * * [he] let her have * * * [his] car and she took * * * [his] car down there and she didn't do anything but play around and mess around, etc. It was costing * * * [him] money. * * * [He] couldn't stand it any longer and * * * [he] had to bring her home."

Whether a college education is the kind of "necessary of life" courts can require a divorced father to provide is a question which has not heretofore required our consideration. The following quotation from *College Education of Minors* [3] probably reflects the present state of the law in other jurisdictions and we have included it for that reason only, expressing neither approval nor disapproval:

> "The courts have arrived at a variety of solutions to these problems. This variety is the result of the differences of view and the question whether a college education is a necessary of life. Another factor contributing to varying results is the existence or non-existence of a formal agreement between husband and wife defining the extent of responsibility for educational expenses. The emancipation of the child and the attaining of majority have complicated the problem as have other factors such as the ability of the father to pay, the academic standing of the child and in some cases the timeliness, or lack of it, with which judicial relief is sought. Most courts arrive at neither extreme, but reach a variety of conclusions depending on the relative values

**3.** Monroe L. Inker and Robert F. McGrath, *College Education of Minors*, Boston B. J., May 1966, p. 5; reprinted with permission in 6 Journal of Family Law 230, 230-31 (1966).

which they attach to the various factors above mentioned."

In the case at bar the chancellor felt "that this reimbursement should be disallowed because of lack of proof, lack of consent and authorization by * * * [Brown], and not being strictly a necessity." Since we do not think he was clearly wrong we shall not disturb his finding but our holding in this regard must not be supposed to go any further than the case at bar and cases where the facts are not substantially different.

## IV.

The chancellor disallowed Edith's claim for counsel fees. She contends, finally, that this was an abuse of discretion. The chancellor was "of the opinion that as a result of the sale of the real estate, the inheritance of the plaintiff from her mother, and other sources of income, and the fact that she remarried, she has failed to show that her income is insufficient to care for her needs, and counsel fees will be disallowed." Code, Art. 16, § 5 (1966, Repl. Vol.). All things considered we find no evidence of an abuse of discretion.

> *Order affirmed in part, reversed in part.*
> *Case remanded for further proceedings conformable with the views expressed in this opinion.*
> *Costs to be paid by appellee.*