508 A.2d 985

**Charles Robert WILLIAMS**

v.

**Kathleen L. WILLIAMS.**

**No. 85, Sept. Term, 1985.**

Court of Appeals of Maryland.

May 22, 1986.
Motion for Reconsideration Denied July 10, 1986.

Edward J. Lilly, Bel Air, for appellant.

Robert L. Miller, Bel Air, for appellee.

Argued before SMITH, Senior Judge, and ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

COUCH, Judge.

The question presented herein involves whether a trial court could set aside a separation agreement between the parties to this case on the ground that the agreement was so oppressive on the husband that it shocked the conscience of the court.

I

Petitioner, Charles Robert Williams ("Husband" or "Mr. Williams"), and respondent, Kathleen L. Williams ("Wife" or "Mrs. Williams"), were married on September 30, 1967, and lived together as husband and wife for approximately fifteen years. Three children were born as a result of the marriage.

At the time of their separation on May 4, 1982, the parties resided at a family home in Jarrettsville, Maryland, which was owned by them as tenants by the entireties. The husband worked as an engineer technician at the Aberdeen Proving Ground. The wife was a housewife.

Serious marital difficulties arose between the parties in early 1982 when, according to the husband, the wife began keeping unexplained late night hours. A disagreement between the parties followed when the wife returned to the household from a shopping trip around 5:00 in the morning. This resulted in the husband's decision to leave the marital home temporarily and move in with his mother. The separation turned out to be permanent.

Finally, on September 8, 1982, the husband, without the advice of an attorney, signed a Separation and Property Settlement Agreement ("Agreement") prepared by the wife's attorney. Testimony at trial revealed that the husband executed the agreement in hopes that it would lead to

resolution of the marital difficulties and effectuate a reconciliation. The terms of the agreement required the husband to execute a deed ("resulting deed") conveying the marital home to the wife; he did so on September 16, 1982. Further terms of the agreement required the husband to convey the contents of the marital home and a 1982 Thunderbird automobile to his wife. In addition, the husband agreed to pay indefinitely the mortgage on the marital home, the car loan, and all marital financial obligations. In sum, under the agreement the wife was to receive property valued at approximately $131,000. The husband, on the other hand, would retain property valued at about $1,100. Most significant, we think, is the undisputed fact that the husband's total weekly financial obligations under the agreement would exceed his weekly net salary.

Following execution of the separation agreement by the parties, the wife continued socializing with another man. The husband became suspicious and hired a private detective to observe the wife's social activities. After having been convinced of his wife's infidelity, the husband filed a bill of complaint for divorce on the grounds of adultery and sought to set aside the agreement and resulting deed in the Circuit Court for Harford County on January 10, 1983. The wife filed a cross-bill on February 9, 1983, and an amended cross-bill on October 17, 1983, seeking a divorce on the ground of voluntary separation or, in the alternative, on the ground of adultery. She also prayed that the terms of the separation agreement be incorporated into the divorce decree. Following a trial Judge Whitfill, on March 9, 1984, entered a decree granting a divorce to the husband on the ground of adultery, striking the agreement, and setting aside the deed and transfer of the real property.[1]

The wife filed a timely appeal to the Court of Special Appeals which, in an unreported per curiam opinion (No.

---

1. Additionally, the decree ordered that custody of the parties' two youngest minor children, James and Stacy, be awarded to the wife, and that custody of the oldest minor child, Robert, be awarded to the

1035, September Term, 1985, filed April 4, 1985), affirmed the decree of divorce but reversed the circuit court's decree voiding the property settlement agreement and deed to the marital home. In doing so the intermediate appellate court essentially held that the circuit court had no power to void the agreement and deed so long as the husband was competent to enter into a binding contract. The court reasoned:

> "While we can readily understand Judge Whitfill's perception of the disparity and sympathize with his desire to fashion a more equitable result, the law of contracts is more rigid in its application. *Grossman v. Grossman*, 234 Md. 139 [198 A.2d 260] (1964); *Brown v. Brown*, 248 Md. 139 [235 A.2d 706] (1967); *Frana v. Frana*, 12 Md.App. 273 [278 A.2d 94] (1971). As long as the Husband was competent to enter into a binding contract, and the evidence fails to show that he was not, the agreement under the circumstances of this case was binding, at least insofar as it apportioned existing assets."

We granted the husband's petition for a writ of certiorari to consider this issue of public importance. For reasons herein set forth we shall reverse in part the decision of the Court of Special Appeals.[2]

## II

### (A)

In his oral opinion announced at the end of the trial, Judge Whitfill stated:

---

husband's mother. Further, the wife was granted use and possession of the family home, and the husband was ordered to pay the mortgage installments on the family home and child support for the minor children in the wife's custody.

**2.** The parties do not dispute the presumed validity of separation agreements and property settlements entered into by a husband and wife. *See* Maryland Code (1984), Family Law Article, § 8–101; *Frana v. Frana*, 12 Md.App. 273, 278 A.2d 94 (1971); *Owings v. Currier*, 186 Md. 590, 47 A.2d 743 (1946). It is equally understood that courts of this state are empowered to recognize and enforce such agreements. *Eigenbrode v. Eigenbrode*, 36 Md.App. 557, 373 A.2d 1306 (1977).

"I will say first and foremost that the agreement shocks my conscience, and it shocks my conscience because it calls for all of the assets of any consequence to go to the wife. It calls for the obligations of supporting those assets to continue to be that of the husband. The husband says, I'll give you everything, let me out, and you find as a matter of fact that that is a fair trade and a fair deal. This was not a matter of I'll give you everything and let me out. It was a matter of I'll give you everything and then I carry the burden for the balance of the life; the debts, the obligations, the loans, and even to buy the fuel oil. Particularly the reason that it shocks my conscience is because I find as a matter of fact that the obligations that are set forth in the agreement exceed the actual income of the Plaintiff. It is something that he simply could not perform.

\* \* \* \* \* \*

"Whether or not the agreement shocks my conscience has nothing to do with his state of mind or with Mrs. Williams' state of mind at the time the agreement was entered into.

"So, first and foremost, I find the agreement not to be fair, not to be equitable, and, as I indicated, it shocks the conscience of the Court.

\* \* \* \* \* \*

"As to the matter of consideration, taking the Defendant's position there already was a voluntary agreement to live separate and apart in May, the testimony was very emphatic that she had treated the marriage as being over in May and that she believed that he understood the agreement and the marriage to be over, that they had separated with that in mind. So, there was no bargain for an agreement to live separate and apart, because that had already been accomplished. The only thing the agreement would do there is to ratify that on paper and then to deal with the property. So, nobody taking it from the viewpoint she projects was bargaining for that. So, I

believe that there is simply no consideration there, because it is an accomplished fact.

"If I believe Mr. Williams, then, of course, he said he did not expect the marriage to end. I find that there is inadequate consideration for the agreement, because, in fact, what the husband was receiving here is so little in relationship to the value of the assets. Most particularly, the ongoing obligations that he was agreeing to pay.

"Why did he enter into such an agreement? I cannot conceive that a rational person would sign an agreement which gave away all assets of value and at the same time obligated himself to expend his entire paycheck without any funds for him to live on, without any way to develop a life for himself for a period of time. There would have to be some very strong and overriding intangible right or benefit that he was bargaining for there and no such benefit has been shown to me in this particular situation."

The circuit court thus did not make any finding that the husband was mentally incompetent, lacked the legal capacity to contract, acted under duress, was induced by fraud, or that he was the dominated and dependent party in a confidential relation. *See Eaton v. Eaton,* 34 Md.App. 157, 366 A.2d 121 (1976) (affirmed a judicial declaration of invalidity of a property settlement agreement made between married persons which was executed some ten years before they actually separated). The court did not conclude that the separation agreement violated any statutory prohibitions or any fundamental public policy which applies uniquely to such contracts. *See Cronin v. Hebditch,* 195 Md. 607, 74 A.2d 50 (1950) (affirmed the overruling of a demurrer to an equity bill seeking cancellation of a separation agreement, based at least in part on violation of then existing public policy against agreements to procure a divorce). *See also Grossman v. Grossman,* 234 Md. 139, 145, 198 A.2d 260, 263 (1964); Note, *Separation Agreements—Their Present Status?,* 11 Md.L.Rev. 350 (1950). As articulated in the oral opinion of the trial court, it rescinded the agreement, and the deed provided for therein, because the provisions

shocked the court's conscience. Since we are unable to conclude that Judge Whitfill's factual findings were clearly erroneous, we are bound by those findings, as was the intermediate appellate court. Md.Rules 886 and 1086. *Spector v. State,* 289 Md. 407, 425 A.2d 197, *cert. denied,* 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 407 (1981); *Blum v. Blum,* 59 Md.App. 584, 597, 477 A.2d 289, 295 (1984).

The legal doctrine which Judge Whitfill applied in his analysis below is currently labelled "unconscionability."[3] The doctrine is recognized in the Restatement (Second) of Contracts, § 208, which reads:

> "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."

*See* comment b to § 208 and *Hume v. United States,* 132 U.S. 406, 10 S.Ct. 134, 35 L.Ed. 393 (1889) (court affirmed lower court's refusal to enforce in accordance with its terms a written contract under which the United States, by its own unilateral mistake, agreed to purchase a product at a price per pound which represented the market value of the product per hundred weight).

Proper exercise of the application of the doctrine is illustrated by *Straus v. Madden,* 219 Md. 535, 150 A.2d 230 (1959) where our predecessors affirmed the rescission, on unconscionability grounds, of a series of transactions including a contract of sale of realty and deed by a corporation. Factually, *Straus* involved a seller corporation which owned a thirty acre tract of unimproved land which fronted on the Baltimore-Washington Parkway, a limited access

---

**3.** As to unconscionability generally, see *Corbin on Contracts,* § 559B (Kaufman Supp.1984); 15 *Williston on Contracts,* § 1763A (W. Jaeger 3d ed. 1972 & Supp.1985); Spanogle, Jr., *Analyzing Unconscionability Problems,* 117 U.Pa.L.Rev. 931 (1969); Leff, *Unconscionability and the Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485 (1967); and Md.Code (1975), § 2–302 of the Commercial Law Article.

highway, for 2,287 feet beginning at the Parkway's intersection with the north side of Riverdale Road. Twenty acres of the site were zoned for motel use while the remaining ten acres were residential. The corporation sold seven commercial acres, fronting 800 feet on the Parkway, from that portion of the tract farthest from Riverdale Road. Those seven acres had a value of $56,000 for which the seller agreed to take $30,000, consisting of $2,500 in cash and the balance in notes and an assumption by the buyer of seven-thirtieths of the seller's obligations under a first trust on the thirty acre site. The seller further agreed not to develop a motel on the remaining thirteen acres of commercial land and to grant a twenty-six foot wide right-of-way to Riverdale Road along the 1,487 feet of the seller's remaining Parkway frontage. For the $30,000 the seller parted with the property, suffered a decline in the value of remaining property because of the use restriction and incurred liability in the aggregate amount of $114,000. This represented a net decrease of sixty percent in the seller's net worth. In addition, one of the principal stockholders of the corporation was seriously ill and both he and his wife were desperately in need of cash at the time of contracting. They were not represented during the negotiations. As part of the transaction and as a result of the refusal by the holder of the first trust on the entire thirty acres to agree to give a partial release on the seven acres, the seller placed a second trust on its remaining land. This secured a note from seller to buyer in the face amount of $75,000 under which no advances were made. The buyer represented that this arrangement was for the protection of the seller. Actually the purpose of the unfunded second trust was to allow the buyer to advance funds on behalf of the seller in payment of the first trust over and above the buyer's seven-thirtieths obligation. The buyer, however, had no obligation to make any such advances.

Chief Judge Brune writing for the Court said, after reviewing the facts in detail, that

"[t]he Chancellor was clearly warranted in finding this transaction or series of transactions to be unconscionable and such that a court of equity should not permit them to stand, and in ordering the rescission thereof, with the return to the Purchaser of such considerations as the seller Company had received under the transaction or series of transactions." *Id.* at 549, 150 A.2d at 238–39.

Though this Court recognized the general rule that

"mere inadequacy of price will not of itself be sufficient to warrant the rescission of a contract or the refusal of the remedy of specific performance [and that o]ne cannot be relieved of a contract merely because he may have made a bad bargain", *Id.* at 542, 150 A.2d at 235,

*Straus* nevertheless pointed out that the general rule is not absolute. Relying on the law as indicated in *Great United Realty Co. v. Lewis*, 203 Md. 442, 101 A.2d 881 (1954) and as stated in Pomeroy, *Equity Jurisprudence*, 5th Ed., § 928 at pp. 639–641, Chief Judge Brune quoted:

"If there is nothing but mere inadequacy of price, the case must be extreme, in order to call for the interposition of equity. Where the inadequacy does not thus stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted. But even here the courts have established clearly marked limitations upon the exercise of their remedial functions, which should be carefully observed. The fact that a conveyance or other transaction was made without professional advice or consultation with friends, and was improvident, even coupled with an inadequacy of price, is not of itself a sufficient ground for relief, provided the parties were both able to judge and act independently, and did act upon equal terms, and fully understood the nature of the transaction, and there was no undue influence or circumstance of oppression. When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, inca-

pacity, pecuniary necessities, and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative." 219 Md. at 543–44, 150 A.2d at 235.

In the case before us the consideration was grossly inadequate and the burdens on the husband were oppressive to the point that they were impossible to perform. As we have illustrated, Judge Whitfill's fact-findings on these scores are clear and forceful. His conclusion of unconscionability is supported by findings of additional factors. The trial judge found that

"there was no negotiation in that agreement. I have absolutely no evidence that any of the terms were negotiated by Mr. Williams. The agreement had been put together when he came in."

Further, the court found that the husband

"was not represented by counsel, and the testimony is uncontradicted that there really was no discussion of the issues, other than the amount of the child support. He simply went along with what was there at the time the agreement was put forth."

By way of explanation of why the husband signed the agreement, Judge Whitfill found that the husband

"simply did not believe that this agreement would really be carried through to the ultimate conclusion. I believe Dr. Stonesifer when he says that Mr. Williams does suffer from this compulsive-obsessive neurosis. I think that is the only explanation which can attach to the circumstances as they develop and show why the agreement was signed.

       \*     \*     \*     \*     \*     \*

"Because of the emotional defect or emotional disorder that Mr. Williams was suffering, from his standpoint it simply was an agreement that was a negotiating tool toward the reestablishment of a relationship with his wife."

Accordingly, it was not error for the trial court to review the agreement at issue and apply in its analysis thereto the doctrine of unconscionability. *See, e.g., Dreyer v. Dreyer,* 48 Or.App. 801, 617 P.2d 955 (1980) (court set aside deed entered into by the parties in connection with their divorce, applying unconscionability concept).

### (B)

We also note that the Court of Special Appeals appears to share our view that judicial power exists to void a separation agreement when its terms are so unjust and unfair as to be unconscionable. In *Blum,* 59 Md.App. 584, 477 A.2d 289 (1984), the Court of Special Appeals, by way of general instructions to the trial court on a partial reversal and remand, in an action to set aside a separation agreement, observed that

"[w]hat the chancellor should have done was to look at the consideration and determine if the terms were *so unfair and inequitable as to require that the agreement be set aside.* If they were not, and he held they were not, he should then have considered whether there was a confidential relationship; then he should have considered whether there was duress. If he found there was duress, he should next have considered (1) whether the conditions precedent to setting aside the agreement had been met, including whether the victim had retained the benefits; (2) whether the contract was thereafter ratified; and (3) whether laches applied. Then and only then should he have decided whether to set aside the agreement and reach the issue of a monetary award."

*Id.* at 602, 477 A.2d at 298 (emphasis added). *Cf. McClellan v. McClellan,* 52 Md.App. 525, 533–34, 451 A.2d 334, 339–40 (1982), *cert. denied,* 295 Md. 283, *cert. denied,* 462 U.S. 1135, 103 S.Ct. 3119, 77 L.Ed.2d 1372 (1983) (finding no unreasonable disparity in settlement agreement where wife, in addition to receiving $2,500 in lieu of alimony and support, received use and occupancy of the house, child support, and a college fund for the parties' children); *Bell v.*

*Bell,* 38 Md.App. 10, 15, 379 A.2d 419, 422 (1977), *cert. denied,* 282 Md. 729 (1978) (finding no unfair disparity where wife relinquished her one-half interest in real estate worth $210,000 for $45,000 in property and cash); *Eckstein v. Eckstein,* 38 Md.App. 506, 512, 379 A.2d 757, 761 (1978) (finding settlement agreement not inequitable on its face where wife conveyed jointly owned home to husband in return for $1,100); *Jackson v. Jackson,* 14 Md.App. 263, 269, 286 A.2d 778, 781–82 (1972) (finding settlement agreement not inequitable where wife received $100 per week during the joint lives of the parties to continue two years after the death of the husband in return for real estate valued at $90,000).

Indeed, Judge Whitfill's disposition of the agreement and deed was not inconsistent with the general instructions set forth in *Blum.* As Judge Whitfill concluded the terms of the instant separation agreement were so unfair and inequitable as to shock his conscience, it was unnecessary for his analysis to proceed further under *Blum.* His ruling that the separation agreement and resulting deed must be set aside was proper.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY. COSTS TO BE PAID BY APPELLEE.