# DONALD F. FRANA *v.* HILARY E. FRANA

[No. 624, September Term, 1970.]

*Decided June 11, 1971.*

274

The cause was argued before MURPHY, C. J., and MORTON, ORTH, CARTER and GILBERT, JJ.

*Joseph J. D'Erasmo*, with whom were *Vivian V. Simpson, Joseph B. Simpson, Jr., H. Algire McFaul* and *Simpson & Simpson* on the brief, for appellant.

*Cornelius J. Vaughey* for appellee.

GILBERT, J., delivered the opinion of the Court.

In early 1969, as a result of some marital discord, Hilary E. Frana (Appellee) consulted Lawyers Referral Service of Montgomery County and was referred by them to a member of the Montgomery County Bar. The Appellee had discussions with the attorney relative to a separation from her husband. At her request her husband, Donald F. Frana (Appellant) accompanied her to the attorney's office on two occasions. Appellant testified that the first meeting was a discussion concerning the existing state of affairs between him and his wife and the assorted property. The second occasion, April 28, 1969, was for the signing of the "settlement agreement". At that time the parties signed a paper writing entitled "Property Settlement Agreement" which was executed and acknowledged before a Notary Public. This "Property Settlement Agreement" is in usual form except that no clauses are contained therein (a) providing for the nullification of the Agreement if the parties should cohabit together, or (b) containing a proviso concerning the Agreement's acceptance or rejection by a court. The Agreement does, however, contain the following clause which is significant here:

> "8. The wife covenants that she will not claim maintenance, alimony or support of any kind

for herself, temporarily or permanently, at any time from the husband."

The Agreement also provided that the custody of the two minor children was granted to the wife who "will move to England, and the husband's visitation privileges shall have to be exercised in England, or wherever else the wife may reside". It was agreed that "the husband will pay all the expenses of moving the wife and the aforesaid children to England." The husband further agreed to pay for the support of the children at the rate of $300.00 per month until the last surviving child attained the age of twenty-one, married or was emancipated and unusual medical expenses not covered by medical insurance. There was a division of personal property and the right to the husband to reside in the residence of the parties which was owned as tenants by the entireties upon conditions. The husband agreed to make the monthly mortgage payments including expenses, and to maintain the property. Either party could demand at any time that the residence be sold and the net proceeds divided equally between the parties. Both parties agreed not to molest the other or to contract bills in the other's names or to compel or endeavor to compel the other to cohabit or dwell with him or her. Each declared that he or she had a right to counsel of his or her own choosing and renounced the right to share in each other's estates or to administer thereon. The husband paid the attorney's fee.

The amount of child support was agreed upon by the parties in order to provide tax-free income. The record reveals the following testimony:

"MR. D'ERASMO—Did you discuss the tax aspects of this agreement with Mr. Lynott?"

"MRS. FRANA—Yes, I did."

"MR. D'ERASMO—What did he tell you?"

"MRS. FRANA—He suggested to me that if

> the money was allocated to
> me were all put into child
> support that I might not be
> taxed on this amount."

Immediately after the execution of the Agreement of April 28, 1969 the parties returned to the marital domicile and continued to cohabit together as man and wife until May 12, 1969 when the wife sailed for England accompanied by their two children. On the wedding anniversary of the parties, August 20, 1969, the wife initiated a phone call from England to the husband in which she testified, "I told him that I would like to come back and would he be agreeable?" He said "that he would like to think about it, but that probably we should return."

On September 20, 1969, the Appellant had written to the Appellee advising her that "there is plenty of lolly in your checking account"; that he had "reassembled Erica's doll house and it should be ready for her when she gets back", and that "I have washed some windows as I know you won't do them."

Thereafter, on October 4, 1969, the Appellee returned with the two children to this country and the Appellant met them at Dulles Airport. The parties went immediately to their former place of abode in Rockville, Maryland. Both parties testified that the Appellant did not stay with the Appellee the night of October 4 at their house, and, in fact, he did not return to the house until October 10. Appellee further testified that on October 10 the Appellant returned to the house and they occupied the same bed until October 13, 1969 when she moved downstairs. Mrs. Frana recanted later and testified that she believed she didn't move downstairs until the 22nd of October, and Appellant stated they slept in the same bed for five days from October 9, 1969. Both parties denied that they had sexual intercourse notwithstanding the fact that they shared the same bed, and continued to

occupy the same house until the Appellant removed himself from the same on December 23, 1969. From the time of Appellee's return from England she was keeping a calendar of "things that were happening."

Sometime around October 4, 1969 the Appellee received telephone information relative to her husband and she then obtained the services of an investigator. As a result of such services suit was brought in the Circuit Court for Montgomery County on February 11, 1970, charging the Appellant with the marital offense of adultery and praying: (1) divorce a vinculo matrimonii, (2) custody of the minor children, (3) support and maintenance of Appellee and the minor children, (4) counsel fees, suit costs and private investigator fee, and (5) for such other and further relief as the merits of her case may require. The Appellant answered the Bill in which he neither admitted nor denied the averment of adultery on advice of counsel, pursuant to Maryland Rule 372 b. 1., but denying that he was in anywise responsible for the support and maintenance of the wife as the result of the "terms and provisions of a voluntary separation and property settlement agreement entered into between the plaintiff and the defendant on the 28th day of April, 1969." The matter was referred to a Master for the taking of testimony. The evidence pertaining to the adultery was uncontraverted. The Master concluded that the Appellee had proven adultery and that the parties had reconciled so as to nullify the Agreement of April 28, 1969. The Master recommended that a decree be signed awarding $245.00 a month to the wife as alimony, and that the sum of $180.00 per month be paid as support and maintenance for the two minor children. Both parties promptly filed exceptions. The Appellant excepted on the ground that the wife had waived her right to alimony. The Appellee excepted because she had requested as part of her relief that counsel fees, suit costs and the private investigator fee be paid by the Appellant, and that no reference was made

to the payment of them in the Master's report. The matter came on for hearing before a Judge of the Circuit Court for Montgomery County and the Appellant's exceptions were overruled; the Appellee's exceptions were sustained, and the matter remanded to the Master to recommend counsel fees and costs. On September 16, 1970 the Master filed a supplemental report in which he recommended that the Appellant pay a counsel fee of $300.00 to Appellee's attorney, court costs including costs before the Master of $105.00, and detective bill of $180.00.

On September 25, 1970 the court signed the decree of divorce, embodying therein all of the recommendations of the Master, including the supplemental report.

The Appellant vigorously objects in this court to the award of alimony on the basis that the wife had expressly covenanted that she would not claim maintenance, alimony or support of any kind, temporarily or permanently, at any time from her husband. He argues that the trial court's award of alimony is erroneous and that it was incorrect in its application of the law to the facts. We agree.

Section 28 of Article 16 of the Annotated Code of Maryland provides:

> "Any deed or agreement made between husband and wife respecting support, maintenance, property rights, or personal rights, or any settlement made in lieu of support, maintenance, property rights or personal rights shall be valid, binding and enforceable to every intent and purpose, and such deed or agreement shall not be a bar to an action for divorce, either a vinculo matrimonii or a mensa et thoro, as the case may be, whether the cause for divorce existed at the time or arose prior or subsequent to the time of the execution of said deed or agreement, or whether at the time of making

such deed or agreement the parties were living together or apart; provided, that whenever any such deed or agreement shall make provision for or in any manner affect the care, custody, education or maintenance of any infant child or children of the parties the court shall have the right to modify such deed or agreement in respect to such infants as to the court may seem proper, looking always to the best interests of such infants."

The Court of Appeals has long held that property settlement agreements as between husband and wife are valid. Cf. *Grossman v. Grossman*, 234 Md. 139, 198 A. 2d 260 (1964). In this case the wife specifically waived alimony by the terms of Paragraph 8 of the "Property Settlement Agreement", supra. There was no testimony of any of the parties as to mistake, collusion or fraud, and in the absence of the same a court of equity had no right to modify the contract. See *Rice v. Rice*, 246 Md. 212, 227 A. 2d 742 (1967), *Grossman v. Grossman*.

To hold that the parties' cohabitation immediately following the execution of the agreement of April 28, 1969 terminated the agreement does injury to the intention of the parties; nor are we persuaded that the wife's return from England on October 4, 1969 constituted such a reconciliation as would abrogate the agreement as a matter of law. In fact, both she and Mr. Frana testified that no sexual relationship occurred between the parties accounting from the date of her return and presumably any time after May 12, 1969. The Agreement recited in part:

"WHEREAS, the parties hereto *have agreed to voluntarily separate from each other*, and

"WHEREAS, the parties are desirous of entering into this agreement in order to provide for *the custody, maintenance and support of the*

*minor children, as well as a division of their property,*

"NOW THEREFORE, it is agreed that in consideration of the mutual promises, agreements and undertakings contained herein, the parties hereto agree as follows:

"1. The wife shall have custody and control of the minor children, Erica Frana and Lesley Frana, with the right of the husband to visit said children at reasonable times and places. *It is specifically understood and agreed that the wife, shortly after the execution of this Agreement, will move to England, and the husband's visitation privileges shall have to be exercised in England, or wherever else the wife may reside.*

It is agreed that the husband will pay all the expenses of moving the wife and the aforesaid children to England.

"4. The parties heretofore have divided up the furniture, household furnishings and all articles of personal property, and henceforth each of the parties shall own, have and enjoy independently of any claim or right of the other all such items of personal property, free and clear of any claim by the other.

"5. Each of the parties covenants they will contract no debts in the name of the other, and each agrees to hold harmless and indemnify the other in the event of the breach of this agreement.

"6. The husband will transfer to the wife the 1962 DKW automobile now titled in the husband's name.

"7. The husband shall have the sole and exclusive right to reside in the residence at 4002 Blackpool Road, Rockville, Maryland, which residence is owned by the parties as tenants by

the entirety. The husband will pay the monthly mortgage payments, real estate taxes, and insurance on said residence, and shall keep said property in a well-maintained condition.

Each of the parties shall have the right at any time hereafter to demand that said residence be sold. Upon the sale of said residence each of the parties shall receive one-half of the net proceeds of sale. In the event the husband fails to maintain the house in an A-1 condition, the expense of restoring the home to such a condition shall be borne by the husband out of his proceeds of sale. Upon request to sell the property by one of the parties, the other shall execute such real estate listing agreements, contracts, deeds, or other documents as may be necessary to sell said property at no less than the market price.

"11. Each of the parties hereto declares that he or she has had the opportunity of independent legal advice, and that *each fully understands the facts and has been fully informed of all legal rights and liabilities;* that after such advice and knowledge, each believes this Agreement to be fair, just and reasonable, and that each signs the Agreement freely and voluntarily.

"12. *Each of the parties hereto waives and renounces the right to share in the estate of the other,* and to administer on the estate of the other, and *each releases any and all dower, curtesy or statutory share or other rights in and to the property of the other,* and covenants to execute whatever instruments which may be required to effectuate said waiver, renunciation and release." (Emphasis supplied).

We think that the portions of the agreement quoted herein clearly manifest the parties' intentions notwith-

standing their continued cohabitation until May 12, 1969, and that the agreement was a final property settlement. The language to the effect "that the wife shortly after the execution of this Agreement will move to England, ***" leaves no room for doubt as to their objective in executing the Agreement. The wife expressly waived her right to alimony or support of any kind and elected to have any money that would have been allocated to her added to the child support payments so that she "might not be taxed on this amount."

In *Bellofatto v. Bellofatto*, 245 Md. 379, 226 A. 2d 313 (1967), a separation occurred by mutual agreement and both husband and wife had executed a separation agreement to that effect. By the terms of the agreement the husband contracted to pay unto the wife the sum of $25.00 a week as support. The agreement also contained a provision that if the parties cohabited "the agreement shall become immediately void and of no effect thereafter." The wife instituted a bill of complaint for alimony, counsel fees, court costs and other relief. No answer to the bill was filed because counsel who was to represent the husband did nothing, and as a consequence a decree pro confesso was obtained. Testimony was taken before one of the standing examiners and in the course of the wife's testimony she suggested that her husband should pay her $50.00 a week. The Chancellor signed a decree awarding the wife $50.00 a week as alimony, together with counsel fees, etc. When the husband received a copy of the decree he filed a motion to strike, vacate or modify the final decree, praying (1) that the same be set aside and that he be given an opportunity to answer, or, in the alternative, that the matter be set for hearing before the court, (2) that the court modify the decree by reducing the payments from $50.00 to $25.00 a week and (3) that the court grant other relief. A hearing was held before the court. The separation agreement was introduced into the evidence and the wife admitted the execution of the agreement on her part which had been pre-

pared by her counsel and transfer to her of various property. The trial court concluded that the payment to the wife required in the agreement constituted alimony and not support and that the court had a right to modify it and declined to strike, vacate or modify its decree. The Court of Appeals reversed, saying: "The separation agreement was intended by the parties to be a complete and final settlement of their property and marital rights, including the husband's obligation for the wife's support. *If this were in doubt we would construe the contract against the wife as the separation agreement was prepared at her request and by her attorney.* See *Joseph F. Hughes & Co., Inc. v. Pioneer Fireproof Door Corp.,* 230 Md. 36, 185 A. 2d 383 (1962)." (Emphasis supplied). In the case before us the agreement was likewise prepared by the wife's attorney and at her request.

Even if we were to hold that the child support payments provided for in the agreement were intended to be a sum which would include support for Mrs. Frana, as the testimony indicates, such payments would be support and not alimony and the court of equity could not, in the absence of collusion, mistake or fraud, modify the contract. *Grossman v. Grossman, Bellofatto v. Bellofatto, Rice v. Rice,* supra.

In *Mach v. Baranowski,* 152 Md. 53, the Court of Appeals had before it a case wherein Peter Mach and Josepha Mach entered into a separation agreement based on a valuable consideration providing they should live separate and apart, disposing of personal and real property and the relinquishment by Peter Mach of his rights in his wife's estate and saloon business. The evidence, though conflicting, indicated that the Machs, after the agreement, lived together and were living together at the time of Mrs Mach's death. Mach sought to have deeds executed by Mrs. Mach, in accordance with the power granted in the agreement in which he waived interest in and to her estate, including the provision that he would not "at any time claim any right in any of the

aforesaid property as husband, widower, heir, next-of-kin or successor", declared a nullity. The court quoting from CJ 30 pp. 1065, sec. 847 said:

> "As a general rule a contract of separation is deemed to be annulled, voided, and rescinded at least as to the future or as to executory provisions by reconciliation and resumption of the marital relation ***. Strictly speaking, a contract of separation is annulled and voided, not voluntarily, or necessarily as a matter of law, by a subsequent reconciliation, cohabitation or resumption of the marital relationship, but rather by the intentional renunciation of the agreement which the reconciliation and resumption of the marital relationship sometimes evidences.
>
> *"The effect of the rule upon cases to which it applies may be modified or changed when it was shown that it was not the intention of the parties to the agreement that such reconciliation or resumption of the marital relation was to have the effect given under the rule.* The reconciliation or resumption of the marital relation is in itself evidence of an intention to abrogate the agreement but it is not, in all cases, an abrogation of the agreement. The rule so stated, however, applies only to what are termed 'mere separation agreements', and not to agreements containing a settlement of property rights based on independent consideration." (Emphasis supplied).

The court affirmed the lower court's decision dismissing the bill.

We hold that the continued cohabitation of the parties from the date of the execution of the agreement of April 28, 1969 until the wife departed for England on May 12, 1969 was not under the totality of the circumstances a

reconciliation so as to abrogate the agreement. It is apparent that at the time the parties executed the agreement it would take effect when the wife sailed for England. To hold otherwise would render the wife's discussions with her then attorney, the joint visits to the lawyer's office and the execution of the agreement, an exercise in absolute futility. The testimony established that there was no reconciliation on October 4, 1969, or thereafter.[1]

In our opinion the Chancellor erred in awarding alimony to the Appellee.

*Case remanded for the modification of the decree not in conflict with this opinion. Costs to be paid by the appellant.*

---

1. See Annotation 35 A.L.R.2nd 707-Reconcilation as affecting separation agreement or decree.