620 A.2d 415

**Gloria NOFFSINGER**

**v.**

**Theodore J. NOFFSINGER, Jr.**

**No. 858, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Feb. 25, 1993.

268

Neal J. Meiselman (Linda Haspel, and Haspel & Meiselman, Chartered, on brief), Rockville, for appellant.

Kevin G. Hessler (Harvey B. Steinberg, and Miller & Steinberg, on brief), Rockville, for appellee.

Argued before BLOOM, WENNER and HARRELL, JJ.

BLOOM, Judge.

By a decree dated 3 February 1992, the Circuit Court for Montgomery County granted Dr. Theodore J. Noffsinger Jr.

an absolute divorce and his wife, Gloria Noffsinger, a monetary award of $82,198 and counsel fees of $8,000. Mrs. Noffsinger appeals from the judgment of divorce claiming (1) that the decree was based upon stale testimony, (2) that a certain limited partnership investment and a boat are marital property, and (3) that the marital property interest in the marital home has a value far in excess of that determined by the trial court. Dr. Noffsinger cross-appeals, asserting that a separation agreement executed by the parties was not abrogated by their subsequent reconciliation and that the judge who adopted the master's findings regarding the agreement failed to exercise independent judgment. We shall first consider the issue raised by Dr. Noffsinger's cross-appeal, then address each of Mrs. Noffsinger's issues in turn.

## FACTUAL BACKGROUND

The parties were married 12 August 1977. Each party had children as a result of prior marriages. Dr. Noffsinger adopted Mrs. Noffsinger's two children, William and Kimberle. The couple's marital discord came to a head in June of 1986 when Mrs. Noffsinger left the marital home, complaining that her husband drank excessively. She took up residence with a girl friend in Annapolis until November 1986 when she returned to her husband. In February of 1987, Mrs. Noffsinger again left her husband. During that separation, the parties negotiated and signed a separation agreement dated 11 February 1987.

The agreement required that Dr. Noffsinger continue to pay for the college education of Kimberle, his adopted daughter. As part of the agreement, each party waived the right to claim any monetary award as an adjustment of his or her marital property rights, waived any claim to a share in the other's estate, and waived the right to serve as a personal representative of the other's estate. The parties also agreed to a division of personal property and of state and federal income tax refunds, and Dr. Noffsinger agreed

to pay his wife $1,290 a month for a twelve month period as alimony.

The parties began to see each other again in June of 1987 and resumed living together in the marital home in September of the same year. When the couple reconciled, Dr. Noffsinger ceased paying spousal support but continued to pay Kim's college expenses.

Mrs. Noffsinger left her husband for a third and final time in October of 1988 at which time she filed a complaint for limited divorce, alimony, monetary award, and other relief, alleging that Dr. Noffsinger had constructively deserted her. In his answer, Dr. Noffsinger asserted the validity of the separation agreement. The issue as to the validity of the separation agreement was severed and referred to a master for hearing and recommendations.

After a hearing on 22 June 1989, Master S. Michael Pincus found that the parties intended that the separation agreement be abrogated by virtue of their subsequent reconciliation. Dr. Noffsinger filed exceptions to the master's report and recommendations. Judge Beard denied the exceptions, and the matter was referred to another master for hearing, report, and recommendations on the remaining issues. That hearing was conducted on the 30th and 31st of July 1990. At its conclusion, Master William P. Turner, interpreting Judge Beard's ruling to mean that the separation agreement remained effective for the executed portions of the agreement but not those that were executory at the date of reconciliation, recommended that Mrs. Noffsinger receive a monetary award of $44,000 and $6,000 in counsel fees. Because Mrs. Noffsinger failed to prove constructive desertion, Master Turner recommended that she be denied alimony.

Both parties filed exceptions to Master Turner's report and recommendations. Judge McGuckian presided over the hearing on the exceptions and entered an order affirming the master's proposed recommendations except as to the monetary award, which he increased to $82,198 (approxi-

mately 40% of the value of what Master Turner found to be the marital property in Dr. Noffsinger's name alone) and counsel fees, which he increased to $8,000. Both parties appealed.

## THE EFFECT OF RECONCILIATION ON A SEPARATION AGREEMENT

■ Dr. Noffsinger argues that, because the separation agreement apportioned repayment of debts, allocated tax refunds, released the parties from future obligations, and addressed additional matters such as custody of the minor child and the payment of college expenses, the resumption of cohabitation did not abrogate its provisions regarding support and property settlement. We disagree.

■ Maryland case law unequivocally holds that a separation agreement that is more than just a contract of separation and support is not abrogated by the mere resumption of cohabitation. *Grossman v. Grossman*, 234 Md. 139, 198 A.2d 260 (1964). *See also Frana v. Frana*, 12 Md.App. 273, 278 A.2d 94 (1971). In *Frana* this Court articulated the principle:

> [A] contract of separation is annulled and avoided, not solely, or necessarily as a matter of law, by a subsequent reconciliation, cohabitation or resumption of the marital relationship, but rather by the intentional renunciation of the agreement which the reconciliation and resumption of marital relations sometimes evidences.

*Id.* at 284, 278 A.2d 94 quoting 30 C.J. § 847, p. 1065.

Dr. Noffsinger points to certain language in the report of Master Pincus to support his argument that the master incorrectly viewed the agreement as a mere separation agreement and therefore committed error in finding that the parties' cohabitation had abrogated the agreement. He further argues that Judge Beard incorrectly adopted the master's recommendations without independent review.

Our analysis of Judge Beard's order discloses no error. Master Pincus, on the basis of his findings as to the parties'

intentions, recommended that the separation agreement be declared abrogated by their subsequent reconciliation. On receipt of this recommendation, Judge Beard could have ordered a *de novo* fact-finding or he could have made a ruling based exclusively on the report of the master. *Wenger v. Wenger*, 42 Md.App. 596, 402 A.2d 94 (1979). When relying upon the report of the master, the chancellor should "defer to the fact-finding of the master where that fact-finding is supported by credible evidence and is not, therefore, clearly erroneous. The chancellor, however, . . . always reserves unto himself the prerogative of what to make of those facts—the ultimate disposition of the case." *Id.* at 602, 402 A.2d 94.

The Court of Appeals refined that principle in *Domingues v. Johnson*, 323 Md. 486, 593 A.2d 1133 (1991), by pronouncing that the ultimate conclusions of the master are not merely to be tested by the clearly erroneous standard. *See also Kirchner v. Caughey*, 326 Md. 567, 606 A.2d 257 (1992). Instead, the chancellor must make an independent review of the record and of the facts properly found by the master. *Id.* [323 Md.] at 491, 593 A.2d 1133. If the independent exercise of judgment by the chancellor would produce results different from the conclusions and recommendations of the master, despite the fact that these recommendations were well supported by the evidence, then these recommendations must give way to the independent judgment of the chancellor. *Domingues*, at 491–92, 593 A.2d 1133. Absent a clear abuse of discretion, a decision by the chancellor that is both grounded in the law and based upon factual findings that are not clearly erroneous will not be disturbed. *Ross v. Hoffman*, 280 Md. 172, 186, 372 A.2d 582 (1977).

In the instant case, Master Pincus found that the parties were reconciled for a second time somewhere between May of 1988 and September of 1988, at which time they resumed living together. He also found that Dr. Noffsinger stopped paying alimony once the parties were reconciled, in part because "it was the intent of the parties when they signed

the Agreement to live separate and apart and obviously that intention changed." Based upon the evidence before him, the master also found that Dr. Noffsinger never discussed the agreement with Mrs. Noffsinger between May of 1987 and October of 1988; that Dr. Noffsinger announced to friends and family that a reconciliation had occurred; that upon reconciliation Dr. Noffsinger commenced payment of his wife's charge accounts and condominium mortgage; and that "both parties by their reconciliation in 1987, intended to fully abrogate the Voluntary Separation Agreement of February 11, 1987." In making that determination, Master Pincus found that the separation agreement had been abrogated, not as a matter of law by virtue of the reconciliation, but as a matter of fact because the parties so intended. *Frana*, 12 Md.App. at 273, 278 A.2d 94. Dr. Noffsinger excepted to the master's report and recommendation.

Dr. Noffsinger's exceptions to Master Pincus's report and recommendation did not allege any specific errors in fact-finding by the master.[1] He asserted, as a matter of law, that the parties did not, by their reconciliation, abrogate their separation agreement. Relying on *Wenger v. Wenger, supra,* he also contended that the master's determination that the parties intended to abrogate the agreement was not a "first level" finding of fact but a "second level" or conclusory finding. He was wrong. As Judge McAuliffe, writing for the Court of Appeals in *Domingues,* explained, the distinction "between 'first-level facts,' which should be accepted unless clearly erroneous, and 'more abstract, second-level, conclusory or dispositional facts,' which are not entitled to such deference" as drawn in *Wenger* was too simplistic. The example given by Judge McAuliffe, 323 Md. at 494, 593 A.2d 1133, indicates that the

---

1. In *Domingues,* the Court stated that the chancellor should consider and decide each allegation of error in fact-finding by the master, stating how he resolved each challenge to the master's fact-finding. 323 Md. at 496, 593 A.2d 1133. Since Dr. Noffsinger did not allege any specific error in fact-finding, there was no need for Judge Beard to review and address each finding.

intent with which one acts, although found by use of inferences drawn from other facts, is a fact to be found by the master. Or, as Lord Bowen expressed it in *Edgington v. Fitzmaurice*, 29 Ch.D. 459, 483 (1885), "The state of a man's mind is as much a matter of fact as the state of his digestion."

At the hearing on the exceptions, Judge Beard, after reviewing the record, ruled that Master Pincus was "not erroneous in his findings." Based upon the master's factual finding that the parties intended to abrogate the agreement when they resumed cohabitation, Judge Beard concluded that the voluntary separation agreement had been abrogated, and so declared in an order dated 19 December 1989.

██ Dr. Noffsinger contends that Judge Beard failed to exercise his independent judgment and otherwise failed to adhere "to the required standard of review [as set forth in *Domingues* ] in resolving the matter on exceptions." We disagree. Once the court adopted the master's findings of fact, there was no discretion to be exercised. The sole issue before the court was the continued validity, *vel non*, of the separation agreement, and the factual finding that the parties intended to abrogate their agreement compels the legal conclusion that the agreement was abrogated. Once that fact-finding was determined to be supported by evidence and was therefore not erroneous, there was no room for a discretionary decision. *Domingues* is inapplicable. The decision that the separation agreement was abrogated is grounded in law, *see Wenger*, 42 Md.App. 596, 402 A.2d 94, and *Frana*, 12 Md.App. 273, 278 A.2d 94, and based upon findings of fact that are not clearly erroneous; therefore, Judge Beard's order to that effect will not be disturbed. Md.Rule 8–131(c). *See Eckstein v. Eckstein*, 38 Md.App. 506, 516, 379 A.2d 757 (1978) (appellate courts will only overrule clearly erroneous findings of fact by the trial court).

We also disagree with Dr. Noffsinger's additional argument that Judge McGuckian subsequently erred in adopting the earlier finding of Master Pincus "that both parties by their reconciliation in 1987, intended to *fully abrogate* the Voluntary Separation Agreement of February 11, 1987" and by failing to exercise his independent judgment as to that determination.

When the question arose as to whether abrogation of the agreement applied only to executory provisions at the time of the reconciliation or applied to all provisions of the agreement, executory and nonexecutory alike, the parties urged contrary interpretations. At the hearing on the merits before him, Master Turner noted that "courts have held that the abrogation of an agreement does not effect (sic) the executory portions of it, but only as to future activities." Master Turner recommended that Mrs. Noffsinger receive a monetary award of $44,000.00, representing 20% of the appreciated value of the property acquired after the separation agreement was signed.

█ Exceptions to Master Turner's report and recommendations were heard by Judge McGuckian, who noted:

Master Turner took the position that the voluntary separation agreement of February 11, 1987 (hereafter referred to as "the agreement") was abrogated by the reconciliation of the parties only as to executory provisions (those yet to be performed).... In any event, the court finds that it is not necessary to resolve this question because earlier, Master Pincus found "that both parties by their reconciliation in 1987, intended to fully abrogate the Voluntary Separation Agreement of February 11, 1987." This finding was affirmed by Judge Beard who on December 19, 1989 denied the Defendant's Exceptions to the Report of the Domestic Relations Master. The court believes that Master Pincus' conclusion was as to executed as well as non-executed provisions of the agreement. While the court may not have concluded as did Master Pincus and Judge Beard, nevertheless the court feels constrained to support those earlier judgments

and finds the agreement has no role to play in the issues now before the court.

We agree with Judge McGuckian on that point. Dr. Noffsinger asserts that upon reconciliation the contract of separation was abrogated only as to executory provisions, citing *Mach v. Baranowski*, 152 Md. 53, 58, 136 A. 34 (1927), for support. He further argues that the reconciliation was not intended to nullify the waiver by each party of "any and all rights that either may have, now or in the future," as set forth in the separation agreement. We disagree.

■ Separation agreements and property settlement agreements between spouses are like other contracts where, absent ambiguous language, terms are given their plain meaning. *Feick v. Thrutchley*, 322 Md. 111, 114, 586 A.2d 3 (1991); *Mendelson v. Mendelson*, 75 Md.App. 486, 501, 541, 541 A.2d 1331 (1988). The fifth paragraph of the separation agreement provides in pertinent part:

Each party waives any and all rights that either may have, now or in the future, pursuant to § 8–201 through § 8–213, Title Family Law, Annotated Code of Maryland, 1984 Volume as amended, or as it may be amended in the future, entitled "Property Disposition in Annulment and Divorce", it being the intent of the parties that this Agreement is a total and complete release to each from the other of all matters and charges whatsoever, and except as herein provided, each party, after the execution of this Agreement, shall require nothing whatever from the other as though the marriage relationship had never existed between them.

The evidence supports the factual finding that the parties intended their reconciliation to abrogate the separation agreement in its entirety. Of particular significance were the resumption of cohabitation, the assumption of the wife's charge accounts and mortgage payments by the husband, and the cessation of alimony payments by the husband. It is clear that the parties ceased to regard the marital rela-

tionship as ended and ceased to conduct themselves "as though the marriage relationship had never existed between them."

On its face, the agreement deals entirely with the separation of the spouses, with the contemplation that the separation was intended to be permanent and result in a divorce. It provided that the parties, having separated, would remain separate and apart, as if unmarried, each free of any interference by the other. It provided for custody of and support for the parties' minor child and the college education of the adult daughter. It provided that each party would be solely responsible for his or her debts, and for the filing of joint tax returns. There are only two paragraphs, the fourth and ninth, that deal with property rights of any kind. The fourth paragraph states that the parties have divided their household furnishings and personal property. The ninth paragraph provides that each party was free to dispose of his or her own property (which would be true even if there was no agreement) and that each party waived the right to inherit from and to administer the estate of the other. The latter provisions are designed to become effective if one spouse dies before there is an absolute divorce. With the exception of the acknowledgment of division of personal effects, which might possibly have been intended to have a lasting effect independent of the separation and divorce but which is not at issue in this case, all of the above provisions are clearly and unequivocally related entirely to the agreement to separate.

■■ The provision relied upon by Dr. Noffsinger contained in the fifth paragraph of the agreement is a waiver of marital property rights conferred by §§ 8–201 through 8–213 of the Family Law Article of the Maryland Code (Property Disposition in Annulment and Divorce). As we have pointed out, that statute, and the equitable rights and benefits it confers, does not create or establish property rights, merely equities that do not arise or even have any meaning except in the context of a divorce or annulment. See *Kline v. Kline*, 85 Md.App. 28, 581 A.2d 1300 (1990).

The provision of the fifth paragraph of the agreement, waiving marital property rights, *i.e.*, equitable rights to have the court consider granting a monetary award, are necessarily totally dependent upon the agreement to separate with the expectation that the separation would result in a divorce. It is perfectly logical to conclude from the fact of reconciliation an intent to abrogate all provisions of the agreement dealing with the ongoing rights, duties, and obligations of the parties during the separation and upon divorce, including the statutory "marital property rights" as well as alimony, child custody, visitation, and support.

Master Pincus's factual finding of mutual intent to abrogate the entire separation agreement has support in the evidence and is not clearly erroneous. Judge Beard's order to that effect and Judge McGuckian's recognition of the validity of that order were entirely correct.

## STALE EVIDENCE

Mrs. Noffsinger contends that the trial court erred in granting a divorce based on stale testimony, in violation of Md.Rule S75(c), which provides:

> In an action for divorce, annulment, or alimony in which the testimony has been concluded for more than 90 days without the entry of a final decree, a final decree may not be entered until supported by additional testimony justifying the conclusion that there has been no substantial change since the prior testimony was concluded.

The rule, of course, is intended to insure that nothing in the nature of reconciliation, resumption of cohabitation, or other event that would render the granting of a divorce inappropriate has occurred since testimony was taken. The court would normally expect that counsel, if aware of the occurrence, would inform the court of it. In the absence of collusion, one of the parties would be likely to inform the court. The principal purpose of the rule, therefore, would seem to be to guard against collusion, which was not likely under the circumstances of this case. It is reasonable to

conclude, without additional evidence, that nothing affecting the grounds for divorce occurred between the time testimony was taken and the judgment was entered.

There is no disputing that Rule S75(c) was violated in this case. The testimony was taken before Master Turner on the last two days in July, 1990. It was over a year later that exceptions to Master Turner's report were heard by the court, and another five and one-half months elapsed before judgment was entered.[2]

■■■ The error, however, was waived. Neither party raised the issue of stale evidence or brought it to the attention of the court; neither party requested that additional evidence be taken; neither party moved to vacate, alter, or amend the judgment pursuant to Md.Rule 2–534, in order to comply with Rule S75(c). Therefore, pursuant to Md.Rule 8–131(a), we decline to consider this assertion of error.

## IDENTIFICATION OF NONMARITAL AND MARITAL PROPERTY

Complaining about the amount of the monetary award granted her by the court, Mrs. Noffsinger argues that the trial court erred in affirming the master's finding that Dr. Noffsinger's Eig Enterprises, Inc. (EEI) Partnership investment and his 22–foot Seafarer boat were nonmarital property. We find no error in the trial court's ruling with respect to those assets.

She also complains about the court's failure to recognize that the former marital home is, except for a relatively small nonmarital contribution, basically marital property. We agree that the court erred in apportioning the marital and nonmarital shares in that asset.

---

**2.** We are greatly disturbed by these inordinate delays in concluding a fairly routine, unexceptional divorce case, and we can but hope that this case is not representative of the way such cases are normally handled in the Circuit Court for Montgomery County.

A.

█ We begin the analysis with a brief exposition of the applicable law. Marital property is any property, regardless of titling, that was acquired by one or both parties during the course of the marriage. Md.Fam.Law Code Ann., § 8–201(e) (1984, 1991 Repl.Vol.). The statute expressly excludes as marital property any property acquired prior to the marriage, property acquired by inheritance or gift, property excluded by valid agreement, or property that is directly traceable to nonmarital sources. *Melrod v. Melrod*, 83 Md.App. 180, 574 A.2d 1, *cert. denied*, 321 Md. 67, 580 A.2d 1077 (1990). Any property acquired during the marriage that cannot be directly traced to a nonmarital source is marital property. *See Brodak v. Brodak*, 294 Md. 10, 447 A.2d 847 (1982); *Hollander v. Hollander*, 89 Md. App. 156, 175, 597 A.2d 1012 (1991). The determination of what property is marital and what is nonmarital is important only in the context of the court's ability to grant a monetary award "as an adjustment of the equities and rights of the parties concerning marital property." *Melrod*, 83 Md.App. at 185, 574 A.2d 1. *See Herget v. Herget*, 319 Md. 466, 470–71, 573 A.2d 798 (1990). To establish a monetary award the court must:

[(1)] [I]nitially characterize all property owned by the parties, however titled, as either non-marital or marital.... [(2)] Once characterized, the value of the marital property must be determined. [(3)] Thereafter, the value of the non-marital property of each spouse is assigned to that spouse and the value of the marital property is equitably distributed between the spouses.

*Harper v. Harper*, 294 Md. 54, 81–82, 448 A.2d 916 (1982).

█ The party who asserts a marital property interest bears the burden of producing evidence of the identity and value of the property. *Pickett v. Haislip*, 73 Md.App. 89, 97, 533 A.2d 287 (1987), *cert. denied*, 311 Md. 719, 537 A.2d 273 (1988); *Green v. Green*, 64 Md.App. 122, 139, 494 A.2d 721 (1985). Generally, the burden of proving a fact is on the party bearing the affirmative of the issue. *Sharp v.*

*Sharp*, 58 Md.App. 386, 398, 473 A.2d 499 (1984). When attempting to demonstrate that property acquired during the marriage is nonmarital, the party with this burden must directly trace the property to a nonmarital source. *Melrod*, 83 Md.App. at 187, 574 A.2d 1.

## B.

In the case *sub judice*, Mrs. Noffsinger, the party seeking the monetary award, claims error in the court's finding that interest acquired by Dr. Noffsinger in EEI is nonmarital property. A joint statement of the parties declared this property, along with the marital home and Dr. Noffsinger's Seafarer boat, to be in dispute. The testimony shows that Dr. Noffsinger's investment in EEI totaled $100,000. Dr. Noffsinger acquired that interest with $20,000 generated from the sale of an office building (indisputably nonmarital property)[3] and with an $80,000 loan from Sovran (formerly Suburban) Bank. Dr. Noffsinger testified that he used money generated by the investment itself to repay $60,000 of that loan.[4] Presumably, if the investment itself is determined to be nonmarital, any income generated from it was also nonmarital. Dr. Noffsinger further testified that he paid off the remaining $20,000 debt on the loan with proceeds from the sale of his dental practice. He argues that his dental practice was nonmarital because he owned it prior to the marriage, it did not appreciate in value during the marriage, and the parties excluded it from consideration as marital property by virtue of their voluntary separation agreement. As explained previously, the separation agree-

---

**3.** Upon the sale of his interest in the office building, Dr. Noffsinger received $75,000 cash and a note for $295,000 secured by the first mortgage on the property. Mrs. Noffsinger stipulated that the office building and the note were non-marital property. Dr. Noffsinger testified that income generated by the note during the marriage was placed in a Standard Federal Savings Bank account that exclusively contained non-marital funds.

**4.** The evidence presented disclosed that Dr. Noffsinger received a $76,064 distribution from the partnership on 25 May 1989.

ment was abrogated in its entirety by the parties' subsequent reconciliation and has no bearing on the proper determination of marital property.

 Dr. Noffsinger is mistaken in his belief that by alleging he used nonmarital funds to acquire his partnership interest he has caused the burden of production to shift to Mrs. Noffsinger. The party seeking to demonstrate that particular property acquired during the marriage is nonmarital must trace the property to a nonmarital source. *Melrod,* 83 Md.App. at 187, 574 A.2d 1. Dr. Noffsinger, having the burden of tracing the payments to nonmarital sources, met that burden by presenting evidence to that effect that was believed by the fact-finder. His testimony was sufficient to support the master's finding that the funds used to acquire his interest in the EEI Partnership came from nonmarital sources. *See generally Eckstein v. Eckstein,* 38 Md.App. 506, 516, 379 A.2d 757 (1978) ("we are also bound by the oft enunciated principle that the credibility of witnesses is primarily for the trier of facts and the appellate courts of Maryland will only overrule the findings of fact of a trial judge when they are clearly erroneous"). *See also, Coviello v. Coviello,* 91 Md.App. 638, 655, 605 A.2d 661 (1992), which upheld the trial judge's findings concerning marital property.

 Mrs. Noffsinger contends that a $10,000 check drawn on Talbot Bank and allegedly used as a down payment for the EEI stock (and later partnership interest) consisted of marital funds, in part because Dr. Noffsinger's paycheck as director of Standard Federal Savings Bank was routinely deposited in the Talbot Bank checking account. Examination of this check reveals that it is a cashier's check and not a check drawn on the marital checking account. Mrs. Noffsinger failed to identify anything in the record that would refute Dr. Noffsinger's claim that he used the proceeds of the office building sale as a down payment for the EEI investment. As to the final $20,000 payment on the Sovran (formerly Suburban) Bank loan, Mrs. Noffsinger

asserts that because the payment was drawn on the Talbot Bank checking account it must necessarily contain marital funds. We disagree. Without further evidence or testimony, the mere fact that nonmarital funds rested in the same account as marital funds does not compel the conclusion that the funds commingled. *See e.g., Melrod,* 83 Md.App. at 188, 574 A.2d 1 (only when the spouse chooses to commingle marital and nonmarital funds to the point that direct tracing is impossible does his or her property lose its nonmarital status). Nonmarital funds might rest with marital funds in a bank account for several days without commingling if they are still directly traceable to a nonmarital source. Since the trial court did not err in its determination that Dr. Noffsinger acquired his EEI investment with nonmarital funds from the office building sale ($20,000) and paid the loan with nonmarital funds from the sale of his practice ($20,000), its conclusion that the $60,000 payment from the partnership distribution was also nonmarital is entirely correct.

## C.

Mrs. Noffsinger also contends that the trial judge erred in finding Dr. Noffsinger's 22–foot Seafarer boat nonmarital property.

On 17 June 1988 Dr. Noffsinger purchased the boat in question with a trade-in and a check drawn on his Standard Federal Savings Bank account.[5] Mrs. Noffsinger, asserting that the funds in the Standard Federal account were commingled, points to the deposit of $40,000 in proceeds generated by refinancing a mortgage on a townhouse referred to

---

**5.** Dr. Noffsinger testified that the Standard Federal Savings Bank account contained only non-marital funds:

The income from stock dividends, the income from the first mortgage I hold on the building, any checks I get from Eig Enterprises goes into this account. That type of thing. I never put income from my practice into this account. I kept that in the other account as living expense and used this strictly as an investment and that type of account.

as Quill Place, the alleged deposit of a check Dr. Noffsinger received for services as a director of Standard Federal, and Dr. Noffsinger's inability to identify the account in which he placed funds from two home equity loans and proceeds from various stock sales to support her contention.

Dr. Noffsinger testified that the Standard Federal account contained exclusively nonmarital funds. To rebut that, Mrs. Noffsinger relies principally upon testimony showing that proceeds from the Quill Place refinancing were deposited in the account. There was also testimony, however, showing that Dr. Noffsinger acquired the Quill Place townhouse for $55,000 in 1975, two years prior to the marriage of the parties. To acquire the property, Dr. Noffsinger financed $40,000 of the purchase price with a 25-year mortgage. The property was refinanced in 1987, netting $41,000, which was deposited in the Standard Federal account. As a result of the refinancing, the encumbrance on the property was increased to $82,354. Mrs. Noffsinger asserts that the proceeds from this refinancing should be treated as marital property the commingling of which precludes Dr. Noffsinger from directly tracing the funds used to purchase the boat to nonmarital property. She is wrong.

There is sufficient evidence for the trial judge to conclude that the boat had been purchased with nonmarital funds. Indeed Dr. Noffsinger's testimony regarding the funds placed in the Standard Federal account directly addresses this issue. While Mrs. Noffsinger points to testimony showing that the Quill property was refinanced during the marriage, she has failed to identify any evidence that compels us to conclude that the property is marital. Judge McGuckian apparently concluded that the funds in the Standard Federal account were not marital, and absent a clear error we will not overturn the court's finding of fact—"the appellate courts of Maryland will only overrule the findings of fact of a trial judge when they are clearly erroneous." *Eckstein v. Eckstein,* 38 Md.App. 506, 516, 379 A.2d 757 (1978).

## D.

Having concluded that there was no error in the determination that the parties' separation agreement was abrogated in its entirety by the parties' reconciliation, we must reach the issue of whether the trial judge correctly apportioned the amount of marital and nonmarital interest in the parties' Easton home. Mrs. Noffsinger argues that the trial court erred in its determination of this marital percentage and alleges that all but $18,000 worth of equity in the home is marital.

The evidence clearly established that at the time the parties married (12 August 1977) Dr. Noffsinger's Profit Sharing Trust, a distinct entity, owned what later became the marital home, subject to a mortgage of $50,000 to Talbot Bank of Easton, securing a loan to the Profit Sharing Trust made by the bank on 24 May 1976. Dr. Noffsinger bought the house individually from the Profit Sharing Trust on 13 June 1984. The evidence reflects that the actual consideration for the transaction was $230,000, the appraised fair market value, although the deed specified "no cash consideration."

The purchase price of $230,000 came from five sources. First, Dr. Noffsinger assumed outstanding mortgages of $61,052. Monthly payments thereon were made from the Talbot Bank account, which contained income from his dental practice. Mortgage payments made during the marriage, therefore, were marital contributions, derived from earnings that were clearly marital income. Second, Dr. Noffsinger received a net credit of $70,000 from the Profit Sharing Trust, representing improvements made on the house while it was owned by the trust, in the amount of $94,512, offset by unpaid rent during this occupancy, in the amount of $24,512. Some of those improvements occurred during the marriage, including an addition that was paid for by refinancing the house. Third, Dr. Noffsinger received credit in the amount of $18,073 for principal and interest owed to him on a $7,500 note from the Profit Sharing Trust.

The note was acquired during the original sale of the house (by Dr. Noffsinger and his first wife) to the Profit Sharing Trust on 24 March 1971. That contribution is conceded by Mrs. Noffsinger to be nonmarital. Fourth, Dr. Noffsinger received a $45,000 loan from Talbot Bank. A certificate of deposit was opened in the amount of $45,000 the proceeds of which went to the Profit Sharing Trust. And fifth, Dr. Noffsinger received a $35,121 loan from the Profit Sharing Trust. Mrs. Noffsinger argues that the proceeds of this loan are marital property.

In his findings, the master accepted Dr. Noffsinger's estimation of the Easton residence value at $448,000 at the time of divorce, and the court adopted that finding. The court also concluded that the residence appreciated $218,000 from the time it was reacquired to the time of divorce ($230,000 value at time of reacquisition from the trust; $448,000 at time of divorce). The court found that 20% of the appreciation was attributable to marital funds, or $43,-600. Based upon the evidence presented in the record, we hold that this finding was clearly erroneous and arbitrary.

The evidence presented showed that Dr. Noffsinger assumed, in order to reacquire the property, a $61,052 mortgage as of 9 March 1984. By 15 June 1984, the time the financing was actually accomplished, the mortgage had been reduced to $59,506, according to testimony. At the time of divorce the mortgage had been reduced to $51,096 according to the joint statement of the parties dated 30 July 1990, thus the Noffsingers had paid off $8,410 (Dr. Noffsinger testified that the remaining principal balance at the time of divorce was $51,404). There is no disputing that this debt was reduced with marital funds, Dr. Noffsinger having admitted that payments thereon were largely made with income from his practice.

■ As to the second source of financing, our conclusion is that the $70,000 credit received by Dr. Noffsinger for the improvements, including additions, made to the Easton residence is marital property. The testimony shows

that improvements were made to the house, including an addition sometime in 1979 or 1980. Without offering evidence or testimony tracing payment for these improvements to nonmarital sources Dr. Noffsinger has failed to meet the burden of proving that the property (or improvement) was acquired with nonmarital funds. Because no specific part of the $70,000 credit was traced to a nonmarital source, that entire sum is deemed to have been a marital contribution to the purchase price. *Melrod,* 83 Md.App. at 187, 574 A.2d 1.

 Dr. Noffsinger's third source of financing, credit received for principal and accrued interest on a $7,500 note, remains nonmarital property. Dr. Noffsinger directly traced this $18,073 to the note he acquired from the Profit Sharing Trust during the original sale of the home sometime in 1971. The fourth and fifth sources of the purchase money present an analytically troublesome problem. Dr. Noffsinger received a $45,000 loan from Talbot Bank; he testified that the loan was paid off with the EEI distribution and proceeds from the sale of his dental practice. Although he did not identify when he repaid this obligation, he did specify the source, and his testimony concerning sources of funds for acquisition of assets were generally accepted as true by the trier of fact. Mrs. Noffsinger has not identified any testimony or evidence to the contrary, so we must conclude that the $45,000 contribution was nonmarital.

 Finally, the $35,121 loan made by the Profit Sharing Trust[6] to Dr. Noffsinger must be considered a marital contribution. In his brief Dr. Noffsinger suggests that the trier of fact may logically infer that the repayment of this obligation was accomplished with nonmarital funds because Dr. Noffsinger received a $76,000 distribution from EEI immediately prior to the maturity of the note. Absent any testimony that directly traces repayment of the $35,121 loan to the EEI distribution funds, however, it is apparent that

---

6. Dr. Noffsinger received the loan by signing a five year note payable interest only until its maturation on 29 June 1989.

Dr. Noffsinger has failed to meet the burden of proving a nonmarital contribution of those funds by tracing it directly to a nonmarital source. *Melrod,* 83 Md.App. at 187, 574 A.2d 1.

Under the holdings in *Wilen v. Wilen,* 61 Md.App. 337, 350, 486 A.2d 775 (1985), and *Harper v. Harper,* 294 Md. 54, 80, 448 A.2d 916 (1982), Dr. Noffsinger should be given credit for the net equity attributable to his investment of nonmarital funds. The breakdown of marital and nonmarital interest in the Easton home looks like this:

| Source | Nonmarital | Marital |
|--------|-----------|---------|
| Mortgage | | $ 61,052 |
| Improvements | | $ 70,000 |
| Note interest | $ 18,073 | |
| Talbot loan | $ 45,000 | |
| Trust loan | | $ 35,121 |
| Total | $ 63,073 | $166,173 |

(These figures reflect a purchase price of $229,246 rather than the $230,000 valuation. We do not regard the difference as significant.)

Applying the computation formula of *Grant v. Zich,* 300 Md. 256, 276 n. 9, 477 A.2d 1163 (1984), we may determine the ratio of the nonmarital investment ($63,073) to the total investment in the property ($229,246), which yields 27.51 percent. Applying that percentage to the estimated present value found by the court of $448,000, we compute the nonmarital portion of the property to be $123,244. *See Blake v. Blake,* 81 Md.App. 712, 718, 569 A.2d 724 (1990). The value of the marital portion, derived by subtracting the nonmarital portion from the present value and then subtracting from the remainder the marital debt of $54,096 (the unpaid balance of the mortgage) is $270,660. *See Grant v. Zich,* 300 Md. at 276 n. 9, 477 A.2d 1163.

In the case *sub judice* the trial court found that "20 percent is that percent of the appreciation [ ($218,000) in the value of the home after it was reacquired from the Profit Sharing Trust] which is attributable to joint marital funds or $43,600." After reviewing the evidence and performing

our own calculations, we are unable to find any factual basis to support the trial judge's use of 20% of appreciation in value after reacquisition of the property from the Profit Sharing Trust as the percentage of marital funds. *See Maxima Corp. v. Cystic Fibrosis*, 81 Md.App. 602, 610, 568 A.2d 1170 (1990). That finding, being clearly erroneous, requires that we reverse the lower court and remand the case for redetermination of the percentage of marital interest in the Easton home and a computation of an equitable monetary award based on a proper computation of the value of all marital property.

## CONCLUSION

The issue of stale testimony was not preserved for our review. The trial court correctly found as a matter of fact that the parties' separation agreement had been abrogated in its entirety by their subsequent reconciliation as a matter of fact. It also correctly found that the EEI partnership interest and the Seafarer boat were nonmarital property directly traceable to Dr. Noffsinger's nonmarital funds. Its determination of the value of the former marital home, however, was clearly erroneous, based on an arbitrary percentage of an irrelevant amount.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE–HALF BY EACH PARTY.